Lynda BROOKS; Verna Hobson; Geraldine Bavaro; Harriet Eaton; Jane Doe; and Richard Doe, as parents and guardians of, respectively, Michael Brooks; Theresa Hobson; Lisa Bavaro; Jill Eaton; Joe Doe; and Rachel Roe, Plaintiffs,

v.

George E. PATAKI, as Governor of the State of New York; Rudolph W. Giuliani, as Mayor of the City of New York; Thomas A. Maul; Joel A. Dvoskin; Mary Glass; Marva Livingston Hammons, as Commissioners of, respectively, the New York State Office of Mental Retardation and Developmental Disabilities; the New York State Office of Mental Health; the New York State Department of Social Services, and the New York City Human Resources Administration, Child Welfare Administration; and NEW YORK CITY, Defendants.

Civ. A. No. CV-95-2902 (DGT).

United States District Court, E.D. New York.

Dec. 4, 1995.

---

William J. Burke, Burke and Stone, New York City, Lisa Klee Friedman, New York City, Robert M. Freedman, Freedman and Fish, New York City, for Plaintiffs.

Michael Prieto, New York City, for Proposed Intervening Plaintiffs.

Thomas E. Coval, Clover & Coval, Willow Grove, PA, for Woods Services [not a party].

Amy Abramowitz, Assistant Attorney General, NYS Department of Law, New York City, for the State Defendants.

Paul R. Kietzman, Alan M. Adler, New York State Office of Mental Retardation and Developmental Disabilities, Albany, NY.

Bruce Rosenbaum, Assistant Corporation Counsel, New York City Law Department, New York City, for the City Defendants.

### *MEMORANDUM AND ORDER*

TRAGER, District Judge:

In this action brought by eighteen severely disabled individuals with multiple handicaps and eight others who seek to intervene, *Shafran–Torres v. Pataki*, 95–CV–3803, this court, on November 16, 1995, issued a preliminary injunction ordering the Governor of the State of New York and his Commissioners of the Office of Mental Retardation and Developmental Disabilities (OMRDD), the Office of Mental Health (OMH), and the Department of Social Services (DSS) to fund present placements until orderly transfer of the plaintiffs from their current out-of-state placements to appropriate in-state placements is completed. Plaintiffs and intervenors are New York City residents who were placed in out-of-state residential facilities as children because no suitable in-state placements were available.

By letter dated November 22, 1995, the State defendants have requested this court to stay the preliminary injunction, pending appeal. The application for a stay is denied. The State will, as explained below, suffer no real prejudice if the stay is denied, while the harm to the plaintiffs resulting from a stay would be palpable and unquestionable.

### Discussion

The controlling test on whether a stay should be granted has been stated by the Second Circuit as follows:

> A party seeking a stay of a lower court's order bears a difficult burden. We consider (1) whether the movant will suffer irreparable injury absent a stay; (2) whether a party will suffer substantial injury if the stay is granted; (3) whether the movant has established a substantial possibility, which need not be a likelihood, of appellate success; and (4) the public interest.

*United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir.1995) citing *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993).

### 1. Irreparable Harm to Movant Absent a Stay

■ The State argues that it will suffer irreparable harm through its inability to recoup the funds should it prevail on appeal, thereby diverting its "scarce resources in this time of fiscal austerity" from "other good uses." This argument has no merit and borders on the disingenuous. There is no dispute with regard to the following facts: the availability of budgeted and unexpended Transitional Care Funding (TCF)[1] intended for these and other City residents, the inability of this court to order retrospective relief and the necessity of institutionalization of the

---

1. Transitional Care Funding for residential placement of disabled individuals who have "aged out" of educational placements was first included in the State budget in 1982, as a part of the Aid to Localities Budget. From April 1982 to July 1995, the State budget provided fifty percent reimbursement of local expenses for care of mentally and developmentally disabled adults who as children had been placed in residential schools and institutions by local school districts with the approval of the State Department of Education. There was, however, no corresponding authority for transitional care in substantive law until the Transitional Care Statute was enacted in 1994. Legislative History: Assembly Mem., City Mot. Ex. D at 000010.

In 1994, legislation was adopted (the TCF Statute) increasing the State's share of transitional care costs to sixty percent as of July 1, 1995, and establishing a timetable for the phase out of transitional care to eliminate intake to TCF in 1996 and provide for full state funding as of 1999. 1994 N.Y. Laws, Ch. 600. The statute permitted discontinuation of transitional funding only after "an appropriate, available adult placement or adult services" was offered and, if not accepted, had been upheld as appropriate by an administrative hearing or the period in which to request administrative review had expired. *Id.* § 466(5)(a).

plaintiffs and the State's commitment to providing it.

The 1995–96 State budget already contains funds for 60% of the costs of out-of-state care for the plaintiffs. None of these funds, budgeted to pay for out-of-state placements, have been used for the benefit of the plaintiffs from June 1 to the date of this court's order, a period of five and one-half months. In addition, under *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), this court may not award retroactive relief. Therefore, in the remaining four and one half months of the State fiscal year, there should be more than ample funds to cover the full costs of placement of the greatly diminished group of New York City residents still in out-of-state placements. (Fifty-eight of the 108 eligible individuals identified by New York City in January 1995 were placed by OMRDD into in-state facilities prior to June 1, 1995.) OMH has apparently failed to place any of the unspecified number of persons for which it is responsible. (OMH is responsible for eight of the named plaintiffs and at least one of the intervening plaintiffs.) Further, the State represents in its letter that it is "committed to offering and providing appropriate in-State placements."

These facts do not demonstrate a financial (or any other) hardship for the State. Funding for plaintiffs' out-of-state placements will be replaced by comparable funding for their in-state placements (which the State is committed to providing), either precipitously, if the State were to prevail, or, pursuant to this court's order, when transfer plans based on professional judgment are developed, carefully reviewed, and implemented. The incremental cost, if any, of out-of-state residential placement above that of in-state residential placement for the plaintiffs is not likely to be substantial. No budgetary basis for preferring in-state to out-of-state placements has been asserted by the State defendants nor was one given in the TCF Statute Legislative History as a reason for gradually ending out-of-state placements. *See* Tr. at 48, Legislative History: Assembly Mem., City Mot.Ex. D at 000012. In fact, plaintiffs have alleged,

and State defendants have not contested, that out-of-state placements were in some instances, at least, substantially *less* costly than in-state placements. Pltf.Mot.Ex. 8, Brooks Aff.

In addition, any incremental costs that may accrue would be incurred only for the relatively limited time required to propose, review and accomplish the plaintiffs' transition to appropriate in-state placements. OMRDD asserted, in its opposition to plaintiffs' state court action for a declaratory judgment, that "a declaratory judgment concerning a potential funding gap should not be permitted because it is (a) premature and thus not a justiciable controversy ..." and "because OMRDD is presently seeking to place the individuals, including petitioners, now receiving that funding in appropriate in-state facilities prior to [June 30, 1995], the 'potential funding gap' may never occur." State Mem. of Law at 2, 6. Although this has been proved to be overly optimistic, nonetheless, as noted above, OMRDD did succeed, by June 1995, in transferring to in-state placements fifty of the 108 individuals in out-of-state placement identified by the City in January 1995. Instead of proceeding with the transfer process that it had embarked upon and promised that it would follow, for some inexplicable reason, the State brought the entire procedure to an abrupt end six weeks after the City withdrew from the program.

## 2. Substantial Injury to Non–Moving Party if Stay Granted

■ The State's assertion that a stay will not injure plaintiffs "because the State defendants are committed to offering and providing appropriate in-State placements" ignores the harm that may result from abrupt transition and provides no basis for evaluating how "appropriate" the offered placements are. Testimony and affidavits presented by the plaintiffs certainly raised serious questions about the "appropriate[ness]" of placements offered by OMH during the crisis at the beginning of July.[2] It should be noted that

---

**2.** For instance, the proposed transfer of several plaintiffs from Devereux over the Fourth of July

weekend to a temporary site in-state demonstrated a lack of planning for these plaintiffs' needs.

plaintiffs' current placements were approved by the State of New York only upon a showing that there were no appropriate placements for them within the state.

It is unquestionable that retaining the status quo with respect to plaintiffs' current placements is the only way to protect the plaintiffs' due process rights to necessary safe conditions and freedom from undue restraint, pursuant to *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (2d Cir.1984). Balancing the very lives and functioning of these fragile individuals against speculative and possibly non-existent incremental cost to the State weighs markedly against issuance of a stay.

### 3. Movant Lacks Substantial Possibility of Success on Appeal

The State argues it will prevail on appeal because, first, the State defendants were not fully heard, second, the injunction alters the status quo in requiring the State to pay 100% of the cost of the plaintiffs' care and, third, the injunction was improperly directed at the "State," rather than to State officials who are the actual defendants. Finally, the State argues that plaintiffs' due process and equal protection claims are defeated by res judicata as a result of the determination of the state courts that plaintiffs had no entitlement to TCF under the statute.

### a. Failure to Fully Hear State Defendants

The State defendants were not fully heard because they requested an adjournment on the second day of the hearing, September 12, 1995, representing that they were working with the plaintiffs and the City to partially fund plaintiffs' placements (to the 60% level of the State budget) from June to the conclusion of the state appellate court review. This failed effort succeeded only in delaying these proceedings by two months, and further exacerbated the care-givers' funding deficit in a manner than cannot be remedied by this court.

█ When the court reconvened on November 2, 1995 to hear the report of the aborted settlement, the State did not request the Court to reopen the hearing. Indeed, the State, in its request for a stay, has raised no serious questions with regard to the facts relied upon by the court in its decision. Rather, both at the conference on November 2, 1995 and now in its letter request for a stay, it has relied on legal arguments rather than on any meaningful factual dispute. In any event, the appropriate remedy for the alleged lack of an opportunity to be heard is a request for a reopening of the hearing, not for a stay.[3]

### b. Injunction Improperly Alters the Status Quo

█ The State also asserts that it is likely to succeed on appeal because the injunction improperly alters the status quo by ordering the State to provide 100% funding for plaintiffs' placements. However, such funding is the *only* way to retain the status quo for these severely disabled plaintiffs. Without such funding the care-giving institutions cannot afford to retain plaintiffs. Failure to provide such funding after six months would effectively foreclose plaintiffs' claims.[4]

### c. Order Directed to "State" Rather than to State Defendants

The State correctly notes that the court has incorrectly ordered "the State of New

Where individuals are as fragile as these, a transfer first, exercise professional judgment second approach can result in irreparable harm. The State's transfer of responsibility for one plaintiff from OMH to OMRDD following a parent's July 1995 visit to the in-state facility proposed for his daughter raises questions as to the depth of understanding of plaintiffs' needs on the part of the State agents determining "appropriate placement."

3. If the State requests, the court is ready to resume proceedings to hear the State's witnesses and plaintiffs' rebuttal case, but this is not a reason to delay plaintiffs' right to interim relief when, through no fault of their own, the hearing was adjourned.

4. Woods School, which provides care to seven of the plaintiffs, appeared before the court on November 2 to describe the financial crisis this dispute has created, with $78,000 in costs accruing each month, or over $500,000 to date.

York" to fund placements rather than directing the named State defendants. Taking cognizance of this formal distinction, I hereby clarify the object of the injunction to comply with the *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), formula. Governor Pataki and other named State defendants are hereby ordered to take all necessary steps, including but not limited to payment of the out-of-state facilities at which plaintiffs currently reside, maintenance of plaintiffs in their present placements until, following evaluation procedures evincing the exercise of professional judgment, in compliance with the standards enunciated in *Youngberg* and *Good Will*, orderly transition to permanent State approved placement is accomplished. Orderly transition is to include the proposal of, and opportunity to visit, appropriate, available, long-term placements plus an opportunity for the plaintiffs and their parents/guardians to obtain independent administrative and/or judicial review.

### d. Plaintiffs' Claim Barred by Res Judicata

 The State defendants insist that, contrary to the court's conclusion, plaintiffs' claims are barred by res judicata. This court continues to disagree, holding that the State's precipitate actions following the end of TCF in June 1995 inflicted new constitutional injury upon the plaintiffs that could not have been raised in litigation concluded prior to its occurrence. Final resolution of the funding issue in state court (now affirmed by the Appellate Division for the First Department, but still possibly subject to review by the New York Court of Appeals) did not authorize the State to subject plaintiffs to unconstitutional treatment by depriving them of their interest in humane institutionalization without procedural due process.

Interestingly, in the case cited by the State for the proposition that res judicata bars this court from considering the plaintiffs' post-State court decision claims, *Balderman v. U.S. Veterans Administration*, 870 F.2d 57, 62 (2d Cir.1989), the Second Circuit held the plaintiff *could* litigate a second claim arising from his transfer from full-time to part-time status where a second consequence of the transfer occurred only after the first action was concluded. The court permitted the second litigation to proceed "... because, at the time of [his earlier suit] his employment had not been terminated. Thus, the present claim could not have been litigated in the [earlier suit]." As in *Balderman*, plaintiffs could not litigate abrupt, unreviewed transfers by the State until the State actually undertook such action.

### e. TCF Entitlement Critical to Plaintiffs' Due Process Claim

In their assertion that the plaintiffs' due process claim must fail, the State defendants wrongly (if understandably) focus on their obligations (or, as determined by the State court, their lack of obligation) to the plaintiffs under the TCF statute. They ignore the obligation created by the State's determinative role in the out-of-state placement of these severely disabled individuals as children and its determinative role in their continuing out-of-state placement when TCF funding ceased. It was the inadequacy of the State's effort to make appropriate in-state placements available that left plaintiffs stranded without funding when the City terminated its participation in TCF.[5]

 Moreover, the State defendants misconstrue the plaintiffs' due process entitlement under the Constitution: it is not that

**5.** The litigation by the City against the State clearly established the State's responsibility for prolongation of out-of-state placement of plaintiffs. *City of New York v. Webb*, No. 40313/86 (Sup.Ct.N.Y.County). In 1991, *Webb* was settled under a court-ordered stipulation of the parties in which OMRDD undertook to place a minimum of 200 individuals annually from a list of 250 City priority placements, to provide written explanations of any failure to place within twenty-four months of referral, and to place all referrals within thirty months of referral. City Mot., Ex. E.

All plaintiffs into the present action for whom OMRDD is responsible were "priority referrals by the City to be placed under the *Webb* stipulation and who either have not been offered a placement by OMRDD or are challenging their offer of placement through the State's appeal procedure." *NYCEP* Appellants' Record on Appeal, 5/17/95 Rosenbaum Affirm. ¶5 at 135.

In May 1994, the City filed a contempt motion against the State for its failure to comply with the *Webb* stipulation and order. In October 1995, Judge Collazo, while declining to hold the State in contempt for reasons of policy, directed

the plaintiffs were entitled to TCF funding, it is that, once the State undertook to provide residential care for these individuals, it was obligated to provide necessary, safe conditions and freedom from undue restraint determined by the exercise of professional judgment. Having failed to make appropriate in-state placements available to plaintiffs to replace out-of-state residential care which the State itself previously determined to be more suitable for them than any available in-state, the State could not abruptly leave these severely disabled individuals stranded in placements when the City terminated its participation in TCF.

■ Furthermore, even if the State had decided to go out of the business of providing residential placements for the most severely disabled, it had a constitutional obligation to do so in an orderly manner. Sending the parents/guardians of these severely disabled persons letters describing the review process prescribed under the TCF statute and assuring them of the State's commitment to a "smooth transition" to in-state placements and then attempting, as OMH did, to transfer the plaintiffs from long-term placements with minimal notice over the Fourth of July weekend to temporary placements does not evince the professional judgment required under the Constitution. Following such assurances by OMRDD, abandonment of these individuals with unpaid care-givers and failure to complete review of proposed placements as represented, also violated, if less dramatically, the minimal requirements of procedural due process.

The State's notifications to plaintiffs and their parents/guardians and care-givers did not provide adequate notice to permit them to prepare for the cessation of funding. In fact, the State directed plaintiffs' participation in a process that resulted in their continued residence in out-of-state facilities.[6]

OMRDD to reimburse New York City's Child Welfare Administration (CWA) $8,500,000 and New York City Health & Hospitals Corporation (HHC) $572,500 for costs incurred through OMRDD's failure to place priority referrals within thirty months. *N.Y.L.J.* 10/27/95, p. 31, col. 2.

As has been noted, OMRDD succeeded in placing fifty-eight of the 108 eligible individuals identified by the City in January 1995. However,

In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court held that three factors must be considered in determining the constitutional adequacy of procedures used by a governmental entity to deprive a person of a property or liberty interest:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

■ Here, the private interest that will be affected by pre-deprivation hearings is a liberty interest in life and maintenance of functioning, that, if sacrificed, cannot be made whole by damages. The persons affected are a small number of individuals who the State, itself, has found to have severe disabilities that make incorporation into in-State facilities difficult even while it acknowledges its obligation to provide such placement.

The risk posed by erroneous in-state placement potentially involves life itself, especially in the case of those autistic plaintiffs who are very self-destructive. For others, precipitate and unreviewed transfer threatens loss of functioning capacity that has been attained only at great effort.

The beneficial process for proposal and independent review of in-state placements that continues plaintiffs in their present out-of-state placements for its duration should be resumed. The probable value of this process is illustrated by the affidavits and testimony presented by the plaintiffs' parents/guardians. These present vivid examples of rejections of plaintiffs by facilities suggested by the State and of the inappropriate nature of some proposed placements.

OMH apparently failed to place any of the persons for which it was responsible.

6. Funding ended on June 1 but notice was not provided by the State until the end of June. Even if funding had continued until July 1, this notice was clearly insufficient for proper arrangements to be made for placements for these severely disabled persons.

As was noted above, the final factor in determining what, if any, process is due, the Governmental or public interest, does not weigh substantially against a due process requirement of pre-deprivation hearings before plaintiffs are transferred from their existing placements. The incremental cost, if any, of out-of-state placements for a transition period against the cost of alternative in-state placements is not likely to be material. The administrative burden is also not great as the impact of this determination is limited to a group of people that the State itself has defined to be so severely handicapped that residential care was required but could not be provided within the state.

### f. TCF Entitlement Critical to Plaintiffs' Equal Protection Claim

█ As with due process, the State focuses its equal protection argument narrowly on plaintiffs' entitlement (or lack thereof) to TCF funding rather than on their entitlement under the Constitution to humane institutionalization characterized by necessary safe conditions and freedom from undue restraint determined by the exercise of professional judgment. The State has itself created the distinction between persons still institutionalized in out-of-state facilities and those transferred to in-state facilities. It is the unequal treatment meted out to these two groups, arbitrarily divided by State acts and omissions, that violates the equal protection clause of the Fourteenth Amendment.

As previously stated, these severely disabled persons remained in out-of-state facilities because the State did not complete transition before the City funding terminated. For this reason alone, they are to be subjected, if the State's position is accepted, to eviction from the very facilities that the State has previously found to be better suited for them than any in-state facility. The severely disabled persons formerly in out-of-state placements who were transferred by the State to in-state facilities prior to the termination of funding retain full State support, while those left out-of-state receive no State support. In addition, the persons placed in-state are given rights to challenge proposed transfers to other in-state facilities that are being denied to these plaintiffs.

As previously noted, there has been no assertion that out-of-state placement costs more than in-state placement. The State is using a State-created distinction as the basis

for its invidious discrimination. Bureaucratic and procedural delays cannot be permitted to victimize these vulnerable people so unnecessarily.

A decision such as the transfer of a severely disabled person from an existing, appropriate placement, even if out-of-state, to a new one, even if in-state, is exactly the kind of decision that benefits from a formal review. (And, as noted above, the State provides such review for persons institutionalized within the State.) In *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 797, 100 S.Ct. 2467, 2481, 65 L.Ed.2d 506 (1980), Justice Blackmun, writing for the majority, stated:

> Procedural due process seeks to ensure the accurate determination of decisional facts, and informed unbiased exercises of official discretion. To the extent procedural safeguards achieve these ends, they reduce the likelihood that persons will forfeit important interests without sufficient justification.

█ Serious interests are at stake here. While a post-deprivation hearing is adequate when a prisoner has lost a hobby kit at issue in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), a pre-deprivation hearing is required for more important interests like penal and, as here, non-penal, confinement, whenever circumstances permit. *See, Parratt,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (post-deprivation tort remedies are adequate redress for deprivation of property like the hobby kit at issue in the case) as opposed to *Calhoun v. New York State Div. Of Parole Officers,* 999 F.2d 647 (2d Cir.1993) (addition of five days to an inmate's sentence violated inmate's liberty interest and required giving him an adequate opportunity to be heard prior to the deprivation). *See also Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 20, 98 S.Ct. 1554, 1566, 56 L.Ed.2d 30 (1978) ("Although utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation. Moreover, the probability of error in utility cutoff decisions is not so insubstantial as to warrant dispensing with all process prior to termination.")

#### 4. The Public Interest

As the foregoing discussion indicates, in the absence of a financial impact on the State, it is hard to find a significant public interest in denying these severely disabled persons support simply because they remain in out-of-state placements due to the State's failure to complete an orderly transfer process that will place them into in-state facilities.

\* \* \* \* \* \*

Consideration of all the factors that must be established under the Second Circuit's test for issuance of a stay lead to the conclusion that the State has not met its "difficult burden." *Private Sanitation*, 44 F.3d at 1084. Movants have failed to establish they will suffer irreparable harm from enforcement of the injunction where there is no clear indication of *any* financial impact, much less a substantial one. In contrast, it is clear that the plaintiffs will suffer substantial harm from a stay, in fact so much harm that a stay would be tantamount to dismissal. In addition, movants have not established a substantial possibility of success on appeal nor have they established that the public interest would be advanced by a stay. Because, pursuant to *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), this court may only order the State to provide prospective funding and because plaintiffs have a compelling need for equitable relief as they are in great jeopardy of harm after nearly six months without funding, further delay would be unconscionable.

Accurate determination of appropriate placement requires careful review of the plaintiffs' requirements and suitability of proposed placements. Failure to provide such review can lead to the forfeiture of the plaintiffs' interests in humane confinement. Thus the State's offer of "appropriate in-State placements" without a formal review process and with no support for existing placements while the proposed placement is under review is a cruel hoax.

#### Conclusion

Accordingly, the State defendants' motion for a stay of this court's preliminary injunction, pending appeal, is denied. That injunction is hereby revised to order the State defendants, Governor Pataki and the Commissioners of the Office of Mental Retardation and Developmental Disabilities, the Office of Mental Health, and the Department of Social Services to take all necessary steps, including but not limited to payment of out-of-state facilities at which plaintiffs currently reside, to maintain plaintiffs in their present placement until, following evaluation procedures evincing the exercise of professional judgment, in compliance with the standards enunciated in *Youngberg* and *Good Will*, orderly transition to permanent State approved placement is accomplished. Orderly transition is to include the proposal of, and opportunity to visit, appropriate, available, long-term placements plus an opportunity for the plaintiffs and their parents/guardians to obtain independent administrative and/or judicial review.

SO ORDERED.