**SUFFOLK PARENTS OF HANDICAPPED ADULTS; and Irene Hoops; Frank Gatland; Frances Sensale Lenzo; Joyce B. Aron; Lillian Melville Hamid; Margaret DeVoe; Jane Doe, and Richard Roe, as parents and guardians of, respectively, Lora Hoops; Andrew Gatland; James Sensale; Lourdes Aron; Glenna Hamid; Karen DeVoe; John Doe, and Rachel Roe, Plaintiffs,**

**v.**

**George E. PATAKI, as Governor of the State of New York; Robert J. Gaffney, as County Executive of Suffolk County; Thomas A. Maul; James L. Stone; Brian Wing, and John B. Wingate, as Commissioners of, respectively, the New York State Office of Mental Retardation**

432

and Developmental Disabilities; the New York State Office of Mental Health; the New York State Department of Social Services, and the Commissioner of the Department of Social Services; and Suffolk County, Defendants.

Civil A. No. CV–96–0288 (DGT).

United States District Court, E.D. New York.

May 2, 1996.

434

William J. Burke, New York City, for plaintiff.

Amy Abramowitz, NYS Department of Law, New York City, James M. Catterson, Suffolk County Attorney's Office, Hauppauge, NY, for defendants.

1. In *Brooks v. Pataki*, 908 F.Supp. 1142, 1144–45 (E.D.N.Y.1995), a related case concerning TCF recipients who are residents of New York City, an extended discussion of the history of the TCF program is provided.

2. The court's opinion in this case, dated April 2, 1996, *Suffolk Parents of Handicapped Adults v. Pataki*, 921 F.Supp. 970 (E.D.N.Y.1996), sets forth in detail the basis for this finding. *See Suffolk Parents*, n. 3, for a description of the current status of plaintiffs Hamid and Sensale, who were unaffected by the decision granting a preliminary injunction.

3. The object of the injunction previously granted is hereby clarified to refer to the named State

*MEMORANDUM AND ORDER*

TRAGER, District Judge:

This action was brought by four profoundly disabled and medically fragile adults, who have been institutionalized under joint State-local programs for many years, most recently under a program called Transitional Care Funding (TCF). The TCF program was developed to provide a bridge between educational placements of severely disabled persons in residential programs and long-term adult residential care after these persons became adults or, as it is called, "aged-out" of educational placements at the end of the school year in which they became twenty-one. This suit results from an unfortunate dispute between the State of New York and Suffolk County concerning the funding of the TCF program.[1] The rights of plaintiffs under the federal Constitution have been gravely imperiled as the result of Suffolk County's precipitate termination of its funding of the TCF program in late November 1995, effective December 31, 1995.[2]

■ Accordingly, on April 2, 1996, a preliminary injunction was issued, ordering "Suffolk County to resume funding these persons' institutional placements, including arrears to January 1, 1996, for a period of six months from the date of the order, so as to provide TCF [Transitional Care Funding— the State-local program] recipients and the State the opportunity to arrange alternative care in an orderly manner." In addition, the State defendants [3] were ordered to use all

defendants, George E. Pataki, Thomas A. Maul, James L. Stone and Brian Wing, rather than the "State." This complies with "the doctrine of *Ex parte Young*, [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, [and] is regarded as carving out a necessary exception to Eleventh Amendment immunity [a state's immunity from suit in federal court].... [T]he exception is narrow: it applies only to prospective relief ... and has no application in suits against the States or their agencies, which are barred regardless of the relief sought." *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy*, 506 U.S. 139, 146, 113 S.Ct. 684, 688–89, 121 L.Ed.2d 605 (1993).

good efforts, employing professional judgment, to assist plaintiffs in obtaining appropriate alternative care and to assume the burden of funding any TCF placements when Suffolk County's obligations under the order would expire at the end of the six month period.

By letter dated April 8, 1996, Suffolk County, John Wingate, Commissioner of Social Services, and Robert Gaffney, County Executive (County defendants), have requested a stay of the injunction pending appeal. The County defendants also submitted a supersedeas bond in support of their request for the stay of the order to pay plaintiffs' existing arrears. Plaintiffs have submitted a letter in opposition to the County's request. The State defendants' representatives have declined to reply. The representative of the non-profit school, at which three of the four plaintiffs reside, has submitted an affidavit detailing its monthly costs and the total amount in arrears. The County, by letter dated April 12, 1996, has submitted a reply to plaintiffs' response and also an amended motion, adding the County Executive, Robert Gaffney, to the list of movants.

By letter dated April 18, 1996, plaintiffs have requested that a "corrected opinion" be issued indicating that, should the County prevail on appeal, the State would bear full responsibility for plaintiffs' care. The State has submitted a reply, dated April 23, 1996, opposing this request.

For the reasons stated below, the County's request is granted in part and denied in part, and the order is clarified to make explicit the court's view that, should the County prevail on appeal, the State is fully liable for plaintiffs' care from April 2, 1996, the date of the order.

### Discussion

■ The controlling test for whether a stay should be granted places a heavy bur-den on the movant. The Second Circuit has stated it as follows:

> A party seeking a stay of a lower court's order bears a difficult burden. We consider (1) whether the movant will suffer irreparable injury absent a stay; (2) whether a party will suffer substantial injury if the stay is granted; (3) whether the movant has established a substantial possibility, which need not be a likelihood, of appellate success; and (4) the public interest.

*United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1994) citing *Hirschfeld v. Board of Elections,* 984 F.2d 35, 39 (2d Cir.1992).

The first through third components of this test closely correspond to the test that was applied in determining that plaintiffs were entitled to an injunction. *See Suffolk Parents v. Pataki,* 921 F.Supp. at 984 (E.D.N.Y. 1996). In addressing the stay, of course, the County's claim that it will suffer irreparable harm becomes a primary focus. In addition, the test for a stay requires consideration of the public interest.[4]

### 1. Irreparable Harm to Movant Absent a Stay

■ The County argues that it will suffer irreparable harm through its inability to recoup the funds should it prevail on appeal, thereby "depriv[ing] some other program of budgeted funds." The argument is not without some merit, for public funds are certainly not limitless, nor is it the role of the judiciary to determine how they should be distributed. However, the role of the judiciary to review executive and legislative actions and to protect the rights of persons unable to protect themselves from unconstitutional governmental intrusion has also long been recognized. It was recognized, in fact, in the very decisions upon which the finding was based that

---

**4.** The County claims, in its April 12, 1995 letter, that plaintiffs have asserted that the law of the case, *Brooks v. Pataki,* at the Second Circuit denying a stay, governs its request for a stay. The court does not find such a claim in plaintiffs' papers and, if there is such a claim, the court agrees with the County that it is not valid. The court views plaintiffs' submissions from *Brooks v. Pataki* as relevant because of the parallels between the cases. There are, also, as the County urges, and as the Court noted in its decision granting the preliminary injunction, differences between the situations.

the County violated plaintiffs' constitutional right, *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir.1984).

In its letter, the County presents a distorted picture of the actual financial impact of the preliminary injunction on the current arrears for the four plaintiffs, which it asserts are $88,297.84. That figure represents the full cost of institutionalization, but the State will reimburse the County for sixty percent of that cost. Thus the actual, final cost to the County of the arrears will be $35,319.14. The ongoing cost, per month, for plaintiffs is $11,773 after reimbursement by the State. The total cost to Suffolk County for the care of the four plaintiffs for both arrears and a six month phase-out period combined, assuming that *none* of the plaintiffs is placed by the State in the interim, will be $105,957.

Further, although it is not a factor in this decision, it is difficult to accept the assertion in the stay application that the County, because of its "line-by-line, item-by-item budget" is unable to absorb the approximately $106,000 that is the maximum cost to the County from this order after sixty percent reimbursement by the State. Acceptance of the County's assertion of inability to absorb the cost requires one to assume that the $1.6 billion Suffolk County 1996 budget [5] is predicted accurately to its last $100,000, that is, to less than one-hundredth of one percent of the total budget, and, even more significantly, requires one to assume also that the budget contains no allowance for contingencies.

There is no dispute with regard to the following facts: first, budgeted and unexpended State Transitional Care Funding (TCF) [6] intended for Suffolk County residents are available that will reimburse Suffolk County for sixty percent of its phase-out costs. Second, the State's commitment, in the long term, to providing care for plaintiffs is also not in dispute. Finally, there is no *real* dispute about the necessity of institutionalization of plaintiffs, although, as is discussed, infra at 9, the County has, in its request for a stay, for the first time, sought to inject a question as to plaintiffs' need for care.

The 1995–96 State budget already contains funds for sixty percent of the costs of the arrears for plaintiffs' institutional care. None of these funds, budgeted to pay for out-of-state placements, has been used for the benefit of plaintiffs from January 1 to the date of the order, a period of three months. Further, the State has represented that it will reimburse the County for TCF payments it makes. Tr. at 31, 44. From the efforts at placement on which counsel for the State Office of Mental Retardation and Developmental Disabilities (OMRDD) reported at the hearing, the State appears to be committed to offering and providing appropriate in-State placements. Tr. at 15–19. The State reported in its March 8, 1996 letter that it has placed all eight Suffolk County TCF recipients who "aged out" of their education-

---

5. *Newsday*, November 21, 1995, A 7, noting the approval by County Executive Gaffney of the $1.6 billion 1996 budget on November 20, 1995.

6. Transitional Care Funding for residential placement of disabled individuals who have "aged out" of educational placements was first included in the State budget in 1982, as a part of the Aid to Localities Budget. From April 1982 to July 1995, the State budget provided fifty percent reimbursement of local expenses for care of mentally and developmentally disabled adults who as children had been placed in residential schools and institutions by local school districts with the approval of the State Department of Education. There was, however, no corresponding authority for transitional care in substantive law until the Transitional Care Statute was enacted in 1994. Legislative History: Assembly Mem., *New York*

Council for Exceptional People v. Pataki (NYCEP), Record on Appeal to the App.Div., 1st Dep't, at 104.

In 1994, legislation was adopted (the TCF Statute) increasing the State's share of transitional care costs to sixty percent as of July 1, 1995, and establishing a timetable for the phase out of transitional care to eliminate intake to TCF in 1996 and provide for full state funding as of 1999. 1994 N.Y. Laws, Ch. 600. The statute permitted discontinuation of transitional funding only after "an appropriate, available adult placement or adult services" was offered and, if not accepted, had been upheld as appropriate by an administrative hearing or the period in which to request administrative review had expired. *Id.* § 466–5(a).

al placements in July 1995, including one of the two original plaintiffs in this suit.

These facts demonstrate a modest and limited financial hardship for the County for the ongoing placement costs of plaintiffs and arrears. The County's obligations will be satisfied six months after the date of the order, at which point the State will assume full responsibility for any TCF recipients still unplaced or not otherwise discharged under plans evincing the exercise of professional judgment.

### 2. Substantial Injury to Non–Moving Party if Stay Granted

█ It is important to understand just how profoundly disabled plaintiffs are. TCF recipients are not likely candidates for de-institutionalization. For instance, plaintiff Lora Hoops, aged twenty-five, diagnosed as functioning in the profound range of mental retardation, with cerebral palsy and a seizure disorder, has been at The Woods School, in Langhorne, Pennsylvania, since she was placed there by a Suffolk County local school district nineteen years ago, at the age of six. Pltf.Mot.Hoops Aff.

Until its application for a stay, the County did not question the serious nature of these plaintiffs' disabilities. However, as noted, the County, in its letter dated April 8, 1996 requesting a stay, raises the issue that "there is no proof *in the record* that plaintiffs will be harmed even if they are discharged and returned to the care of their parents or guardians." (Emphasis added.) The County fails, however, to provide—or even suggest that there exists—any proof in *its* extensive records of these plaintiffs' conditions that makes this an even colorable claim. These plaintiffs were long known to the County. The County made no assertion that plaintiffs were ineligible for TCF at any time during its administration of the program,[7] despite the powerful financial incentive it had to do so. Nor did the County raise the point in earlier papers or in the hearing on the motion for a preliminary injunction, although specifically asked by this court whether there was a need for a

hearing on any factual issue. Tr. at 44–45. In other words, at a time when plaintiffs would have had an opportunity to respond, the County said nothing. The interposition of this objection at this time leads to the conclusion that it is not only belated, but is not made in good faith.

Significantly, to accept that there is substance to the assertion would require a disregard of the evidence presented by the County's own correspondence (that it urged "spoke for themselves") and the affidavits it submitted. For instance, Paul Kelsch, Assistant Division Administrator in the County Department of Social Services for eleven years, averred his familiarity with TCF, noting that one of the County's roles with respect to TCF recipients was "to determine initial eligibility." Kelsch Aff. dated March 13, 1996. Commissioner Wingate's letter to care-providers on November 24, 1995 stated: "We have notified the parents of the individual involved and we have urged OMRDD to redouble their efforts to locate or develop the *much needed* adult facilities." County Ex.D. (Emphasis added.) Other County correspondence connected with the program contains similar assertions. *See* County Ex. A (Ltr. to parents): "The fact that Suffolk County can no longer [pay for TCF] does not mean a disruption in the continuity of care for [your child].... Urge [OMRDD] to find or develop what is long overdue—appropriate adult facilities for all those who aged out of residential care;" Ex. B (Ltr. to State officials), July 1995: "locate appropriate adult facilities for this population in the next five months;" Ex. C (Ltr. to parents), November 1995: "We are hopeful that the fact that Suffolk County can no longer cover the cost of Transitional Care ... will not mean a disruption in care for your child;" Ex. E (Ltr. to State Officials), November 24, 1995: "We are at this time advising OMRDD, ... of the need for OMRDD/LIDDSO (Long Island Development Disabilities Service Office, the local OMRDD office) to locate suitable adult facilities for this population."

---

7. The County has administered plaintiffs' TCF benefits for nine and one-half years (Gatland), eight and one-half years (DeVoe), four and one-half years (Hoops) and eighteen months (Aron). Kelsch Aff. ¶ 5 dated March 13, 1996.

Further, Suffolk County, by its own admissions, had extensive contact with the plaintiffs during its administration of the TCF program. Plaintiffs' TCF status was effective only through compliance with County and State procedures, a process the County noted that it had seriously pursued its duties in connection with the program:

> Suffolk County has taken its [TCF] responsibilities seriously and its staff follows up regularly when [State agency] reports are vague or overdue.... [The County established procedures to ensure control of the program that became effective June 1, 1991.] The procedure included provisions ... that an application for Services (DSS 2921) be filed, and that application for recertification be made every six months.

Kelsch Aff. dated February 23, 1996.

Although the County objects to the finding that the cost of the adult plaintiffs' placements is beyond their means, it presents no evidence that it is not, despite certain knowledge of plaintiffs' means because of its procedures insuring that "all of the individual's assets and resources (not just SSI) be applied to the cost of care ..." Kelsch Aff. dated February 23, 1996 ¶ 28.

In sum, nowhere in any of the County's submissions, prior to its April 8th letter, is there the slightest suggestion that these four plaintiffs could simply leave the facilities at which they reside without harm. Rather, they establish the contrary. Moreover, the County's argument would also have the court disregard or re-invent the extensive TCF legislative history, incorporated here by reference from *Brooks v. Pataki*,[8] as well as that submitted by plaintiffs here, as Pltf. Ex. 7, that document the program and the nature of the disabilities possessed by its beneficiaries. Former Governor Mario Cuomo described the TCF recipients as "medically fragile or highly behaviorally disturbed adults" in his message accompanying his approval of the statute in 1994. *New York Council for Exceptional People v. Pataki (NYCEP)*, Record on Appeal to the App.Div., 1st Dep't, at 101.

It is unquestionable that, until individual discharge/transfer plans developed with the exercise of professional judgment have been formulated, retaining the status quo with respect to plaintiffs' current placements is the only way to provide the process that is due to protect plaintiffs' liberty interests in safe conditions and freedom from undue restraint, pursuant to *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (1984).

Counsel for The Woods School, at which three of the four plaintiffs reside, recounted the "severe problem" faced by his client at the hearing on March 6, 1996. "[I]t is very important that the Court understand that my client, as a result of its patience, sustained a loss of over three hundred thousand dollars which it has not recouped under *Brooks v. Pataki* and quite frankly I'm here today because my client literally wants to know immediately what is to happen vis-a-vis the Suffolk clients." Tr. at 37–38. Subjecting these non-profit institutions, which cared for New York State residents so severely disabled that no institution in New York State would take them, to unlimited liability for care for these individuals, as both the County and the State have urged, gives fresh meaning to the old saw, no good deed shall go unpunished. Balancing the very lives and functioning of these fragile individuals against a relatively modest and limited incremental cost to the County weighs markedly against granting a stay.

### 3. Movant Has Substantial Possibility of Success on Appeal

The County argues that it will prevail on appeal because this court impermissibly used "the due process clause to nullify governmental acts ... believe[d] to be unwise or incompatible with some particular social philosophy." The County also asserts it will prevail on appeal because the injunction was based on a legal argument that reliance created by the County's communications estopped the

8. 95 CV 2902, decisions reported as 908 F.Supp. 1142 (granting injunction) and 908 F.Supp. 1157

(denying State's request for a stay).

County from withdrawing. In addition, the County argues that the order, as it related to the arrears for care of plaintiffs, constituted a mandatory injunction, representing partial summary judgment in favor of plaintiffs. Finally, the County repeats its arguments that the County defendants were not fully heard, specifically referring to the lack of a hearing concerning plaintiffs' conditions and resources.

### (a)

■ Turning to the last argument, in view of the extensive legislative history and prior state litigation relating to TCF, this court was not required to take new testimony to establish first, that the TCF program was for the multiply disabled nor, second, to determine that plaintiffs had such multiple disabilities, and third, to determine that plaintiffs' resources were not adequate to cover the costs. The State's and the County's administration of the TCF program established all of these, in the absence of any colorable claim to the contrary by the County.

Moreover, to award preliminary relief, it is not always necessary to seek evidence beyond the pleadings and submissions. The County has raised no non-frivolous questions of fact in its latest submission; nor did it do so at the conference held on March 6, 1996 nor in its earlier submissions. It has raised a number of non-frivolous disagreements as to law in these submissions. The April 2, 1996 memorandum and order, drawing on *Drywall Tapers and Pointers v. Local 530*, 954 F.2d 69, 76–77 (2d Cir.1992) (brackets in original), noted:

> Although a hearing is generally required on a motion for a preliminary injunction, "Fengler does not stand for the proposition that a hearing must be held in all preliminary injunction cases.... The most significant factors [on which the injunction was based] ... would have remained essentially unchanged by any additional evidence."

Quoting *Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir.1988), citing *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745 (2d Cir.1987). No evidentiary hearing is required here because the documents submitted by the County, as it requested, "speak[ ] for themselves," and make clear that the County "official[ly]" withdrew from TCF only in late November 1995. Sklar Ltr. dated March 13, 1996, Tr. at 44, Commissioner Wingate Ltr. to State officials dated November 24, 1995. Because no claim was made that Suffolk County's participants were significantly different from those elsewhere in the state, the legislative and litigation history of the TCF program is relied upon. This history provides ample evidence of the nature of the participants and the State's problem in making placements other than TCF available to them.

### (b)

■ The County argues that the right to procedural due process "must" emanate from state law, apparently on the basis that persons "not involuntarily confined to institutions" have no protected interest in safe institutionalization under the Constitution. This argument places unwarranted emphasis upon the "voluntary" character of plaintiffs' placement, a feature specifically discounted by the Second Circuit in *Good Will*, 737 F.2d at 1246, with respect to similarly disabled, institutionalized persons. "Even granting that the State of New York was not required to build schools for the mentally retarded or admit voluntary residents, once it chose to house those voluntary residents, thus making them dependent on the state, it was required to do so in a manner that would not deprive them of constitutional rights." Here, Suffolk County chose to participate in the institutionalization of these plaintiffs through its participation in TCF. Having chosen to participate, it could not withdraw in a manner that would deprive plaintiffs of their constitutional rights to safe confinement.

In addition, there is a genuine issue as to whether, in any event, there can be "voluntary" placement of adults too disabled to give consent for themselves, who had been institutionalized as children with the consent of their parents/guardians, and who would not be permitted to leave their institutions if they merely asked to do so. *See Suffolk Parents v. Pataki*, 921 F.Supp. at 981 (E.D.N.Y.1996), noting that the Eighth Cir-

cuit, in *Kennedy v. Schafer,* 71 F.3d 292, 294 (8th Cir.1995), stated: "We see no reason why a patient originally committed voluntarily must retain that status permanently. Facts change, and legal status follows facts." That court suggested that a reasonable basis for testing whether someone is a "voluntary" patient is whether the patient "had the absolute right to leave the hospital by simply requesting to be released." *Id.* at 295.

■ It is instructive that the County fails to address the holdings of *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239 (2d Cir.1984), except by its aside with respect to voluntary placement, but rather chooses to assert that "the right to procedural due process [must] emanate from state law," citing for this proposition a 1963 decision concerned with state laws limiting entry into the trade of debt adjusting to lawyers, *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93. The Second Circuit, in *Hertz Corp. v. City of New York,* 1 F.3d 121, 132 (1993), noted the limitation of the holding of *Ferguson* to economic regulation: "[S]ince demise of substantive due process in economic area, due process provides legislative bodies broad scope to experiment with economic problems." (Summarizing *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 106–07, 99 S.Ct. 403, 410, 58 L.Ed.2d 361 (1978)). *Ferguson* is, of course, a statement of the post-New Deal Court's disfavor for *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), standing for the use of substantive due process to invalidate state regulation of commercial dealings, an issue that has little relevance to the liberty interests of institutionalized severely disabled adults here affected by the County's withdrawal from the TCF program.

In fact, entitlement to procedural due process is not solely dependent on state law as the County asserts. The Second Circuit, in *West Farms Associates v. State Traffic Commission,* 951 F.2d 469, 472 (2d Cir.1991), quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), held that, for an interest to rise to the level that its threatened deprivation invokes constitutional procedural due process requirements, " 'the nature of the interest [must be] one within the 'liberty or property' language of the Fourteenth Amendment.' "

Procedural due process is essential to assuring these individuals' interest in safe confinement, for the very reasons identified by Justice Blackmun, writing for the majority, in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 797, 100 S.Ct. 2467, 2481–82, 65 L.Ed.2d 506 (1980):

> Procedural due process seeks to ensure the accurate determination of decisional facts, and informed unbiased exercises of official discretion. To the extent procedural safeguards achieve these ends, they reduce the likelihood that persons will forfeit important interests without sufficient justification.

■ Serious interests are at stake here. While a post-deprivation hearing is adequate when a prisoner has lost the hobby kit at issue in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), a pre-deprivation hearing is required for more important interests like penal and, as here, nonpenal confinement, whenever circumstances permit. *See Parratt,* (post-deprivation tort remedies are adequate redress for deprivation of property like the hobby kit at issue in the case) as opposed to *Calhoun v. New York State Div. Of Parole Officers,* 999 F.2d 647 (2d Cir.1993) (addition of five days to an inmate's sentence violated inmate's liberty interest and required giving him an adequate opportunity to be heard prior to the deprivation). *See also Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 20, 98 S.Ct. 1554, 1566, 56 L.Ed.2d 30 (1978) ("Although utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation. Moreover, the probability of error in utility cutoff decisions is not so insubstantial as to warrant dispensing with all process prior to termination.").

### (c)

■ Although the County argues that the April 2nd opinion accepted plaintiffs' reliance theory and held that the County was estopped thereby from withdrawal from TCF,

in fact, it specifically relied on the timing of the County's official action, in particular, the formal adoption of the County's 1996 Budget, as the appropriate point for determining the County's duty. Reliance was not placed on numerous unilateral and often contradictory communications by any of the several political actors in the County Executive and Legislature. Even though plaintiffs may have asserted such a theory, it was not the basis for the decision. Moreover, the County defendants have misconstrued the court's holding with regard to plaintiffs' due process entitlement under the Constitution. It is not that plaintiffs are entitled to TCF funding because of their disabilities: it is rather that, once the County undertook, along with the State, to provide residential care for these individuals, it was obligated to provide necessary, safe conditions and freedom from undue restraint, determined by the exercise of professional judgment.

█ Having provided less than six weeks notice that it was withdrawing support for their care, the County cannot abruptly leave these severely disabled individuals stranded without providing a phase out that permits them to obtain, with the exercise of professional judgment, alternative care. When the County decided to go out of the business of providing residential placements for these severely disabled adults, it had a constitutional obligation to do so in an orderly manner. Adopting a budget in late November 1995 that ended TCF funding as of December 31, 1995 was not enough. It abandoned these individuals at their unpaid care-givers and failed to provide adequate time for the consultative process required for proper alternative arrangements to be made. The County thus violated its procedural due process obligations to plaintiffs.

█ The County's obligations are, however, proportionate to its financial and programmatic responsibilities and, in any event are lesser obligations than those of the State. In view of the State's longer and controlling involvement in plaintiffs' institutionalization, its procedural due process obligations to plaintiffs are commensurately far greater. Thus, should the County prevail in its appeal of the court's order, the State's obligations to plaintiffs dictate that it must immediately assume funding of plaintiffs' care, so as to preserve their interests in humane confinement.[9]

The County's action in late November did not provide adequate notice to permit the parents and the State and the institutions to prepare for the cessation of funding. Thus plaintiffs have a likelihood of success on their constitutional claims and the balance of hardships certainly tips in plaintiffs' favor. The Second Circuit has recently ruled that where activity has been enjoined that "qualif[ies] as action taken 'pursuant to a statutory ... scheme,'" the plaintiff must demonstrate not only irreparable harm and "'sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief,'" meeting what is known as the "fair ground for litigation standard," but, rather, the more demanding standard of "likelihood of success on the merits." "This exception reflects the idea that governmental policies implemented through legislation ... through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995). Here, plaintiffs have clearly met that more stringent standard.

**4. The Public Interest**

█ The County asserts that the public interest is determined here by the "judgment ... of the electorate of Suffolk County as expressed through its elected officials.... [They] were elected on platforms to reduce government spending." Presumably, elimination of care for the four plaintiffs is required to accomplish that goal. Under the

---

9. The State, in its letter opposing this clarification of the order, characterizes plaintiffs' request as an untimely motion to reargue. In fact, this clarification merely makes explicit an obvious corollary to the apportionment of liability for the violation of plaintiffs' constitutional rights between the County and the State. The long-term, continuing liability is that of the State while the County has limited phase-out liability. Should the County prevail on appeal in its argument that it has no liability, clearly the State's total liability merely attaches earlier.

County's argument, any harm that may befall plaintiffs, even the loss of hard-won functioning skills or even life, is unworthy of consideration compared to a reduction in the County budget amounting to less than one one-hundredth of a percent.

However, another public interest—this one a constitutional one—espoused by the Supreme Court in *Youngberg* and the Second Circuit in *Good Will,* is found in the requirement that state actors who played a controlling role in the continuing institutionalization of the plaintiffs must use professional judgment in deciding issues that have a substantial impact on the institutionalized care of severely disabled persons, where their lives and basic functioning are at stake. The preliminary injunction is required to maintain the status quo so that plaintiffs may assert their rights in litigation and to proceed to make alternative arrangements with assistance of professional judgment.

Accordingly, there should be no stay of that portion of the injunction under which the County, for a maximum of six months from the date of the order, will maintain plaintiffs in their present placements, pending development of alternative in-state placements by the State. The incremental cost to the County is limited. The administrative burden is also not great because the impact of this determination is limited to a group of people that the State has determined, and the County has confirmed, to be so severely handicapped that residential care was required but could not be provided within the state.

## 5. Mandatory Injunction

▉ Finally, the County argues that the relief provided under the preliminary injunction may be characterized as a "mandatory injunction," granting plaintiffs the ultimate relief they requested. The objective in issuing the preliminary injunction here was to retain plaintiffs' status quo because, unless it is retained, plaintiffs would be irreparably harmed, losing the object of their suit before there is any opportunity for it to ever be decided on the merits.

In addition, the County also argues, perhaps in the alternative, that the opinion effectively granted partial summary judgment on the issues of the arrears for plaintiffs' care from January 1, 1996 to the date of the order, April 2, 1996. Apparently on this basis, the County has asserted that its provision of a supersedeas bond complies with Rule 62(d) and entitles it to an automatic stay of the order to pay arrears. Charles A. Wright, Arthur R. Miller & Mary Kay Kane, note that: "[An automatic stay upon appeal] may not be obtained in injunction cases . . . In those . . . cases it is discretionary with the court whether to allow a stay." 11 *Federal Practice and Procedure* § 2905 (1994).

On the other hand, without crediting the County's assertion that the order to pay the arrears constituted partial summary judgment, exercising the court's discretion with regard to a stay in connection with an injunction, the order to pay the *arrears* is stayed without prejudice to plaintiffs' production of evidence that the status quo cannot be maintained unless the arrears are paid. *See* Fed. Rule Civ.Proc. 62(c):

> When an appeal is taken from an interlocutory . . . judgment granting . . . or denying an injunction, the court in its discretion may . . . modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

*See also Newton v. Consolidated Gas Co. of New York,* 258 U.S. 165, 177, 42 S.Ct. 264, 267, 66 L.Ed. 538 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of Justice require, preserve the status quo until decision by the appellate court."). There has been no evidence that the patience shown by the institutions at which plaintiffs reside, although it cannot continue indefinitely, would not be preserved by payment of ongoing costs, with payment of the arrears to await the results of an appeal.

———

Consideration of all the factors that must be established under the Second Circuit's test for issuance of a stay lead to the conclusion that the County has not met its "difficult burden." *Private Sanitation,* 44 F.3d at 1084. Movants have failed to establish they

will suffer irreparable harm from enforcement of the injunction where there is a modest financial impact. The monetary harm that will be suffered by the County if a stay is denied, sixty percent of which is eligible for reimbursement from the State, can scarcely be compared to the personal harm that is likely to befall these plaintiffs were a stay granted. In contrast, it is clear that plaintiffs would suffer substantial harm from a stay. In addition, movants have not established that the public interest would be advanced by a stay, while plaintiffs have established a substantial likelihood of success on appeal.

Accurate determination of appropriate placement requires careful review of plaintiffs' requirements and suitability of proposed placements or other discharge arrangements. Failure to provide such review can lead to the forfeiture of plaintiffs' interests in humane confinement. Thus the County's abrupt cessation of Transitional Care Funding with no prospect for immediate or even prompt transition to existing placements must be enjoined.

### Conclusion

Accordingly, the Suffolk County defendants' motion for a stay of the preliminary injunction, pending appeal, is denied in part and granted in part. That portion of the County's request for a stay that relates to the payment of arrears is granted without prejudice to plaintiffs' right to apply for reinstatement upon a showing that the status quo cannot otherwise be maintained. That portion of the County's request for a stay relating to the order to pay the on-going costs of institutionalization is denied.

The injunction is hereby revised to order the State defendants, Governor Pataki and the Commissioners of the Office of Mental Retardation and Developmental Disabilities, the Office of Mental Health, and the Department of Social Services, following the expiration of the six month period for which the County is responsible for TCF, or, should the County prevail on appeal, as of April 2, 1996, to take all necessary steps including, but not limited to, payment of out-of-state facilities at which any plaintiffs still reside under TCF, to maintain plaintiffs in the TCF placement

until, following evaluation procedures evincing the exercise of professional judgment, in compliance with the standards enunciated in *Youngberg* and *Good Will,* orderly transition to permanent State approved placement or other discharge arrangement is accomplished.