**WESTCHESTER ADVOCATES FOR DISABLED ADULTS; and Stephen Goodhue; Paul Eiseman; Louis Enker; Roni Enker; Nancy Guiddy; Esteban Silvera; Alicia Silvera; Veronica F. Brophy; Jane Doe, and Richard Roe, as Parents and Guardians of, Respectively, Jason Goodhue; et al., Plaintiffs,**

v.

**George E. PATAKI, as Governor of the State of New York; Andrew O'Rourke, as County Executive of Westchester County; Thomas A. Maul; James L. Stone; Brian Wing, and Mary E. Glass, as Commissioners of, Respectively, the New York State Office of Mental Retardation and Developmental Disabilities; the New York State Office of Mental Health; the New York State Department of Social Services; and the Commissioner of the Department of Social Services of Westchester County; and Westchester County, Defendants.**

Civil Action No. CV–96–0930.

United States District Court, E.D. New York.

June 21, 1996.

Burke and Stone, New York City, for Plaintiffs.

NYS Department of Law, New York City, Westchester County Attorney's Office, Department of Law, White Plains, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, District Judge:

This case against Westchester County and State of New York officials and Westchester County is the third of three cases concerning the care and treatment of profoundly disabled and medically fragile adults whose rights under the federal Constitution have been gravely imperiled as the result of an unfortunate funding dispute between the State of New York and three of its local governments. These adults have been the beneficiaries of a joint state and local program called Transitional Care Funding (TCF). The program was developed to provide a bridge between educational placements of severely disabled persons in residential programs and long-term adult residential care when they "aged-out" of educational placements at the end of the school year in which they became twenty-one.

This action arises from the withdrawal from TCF by the Westchester County (County) Department of Social Services (DSS) in November 1995. The first suit arose from the withdrawal by New York City from TCF at the end of May 1995.[1] Following New York City's successful withdrawal, in November 1995, both Suffolk and Westchester Counties emulated New York City's withdrawal from the program.[2] This court entered an order directing Suffolk County to resume payment of plaintiffs' residential care for a period of six months, with the State to assume full funding of any plaintiffs remaining in out-of-state placement at the end of that period. That order, however, has been stayed by the Second Circuit with respect to the County, pending appeal, and is presently in effect with respect to the State.

**Background**

1. *The Plaintiffs*

(a)

The present action involves six severely disabled, multiply handicapped, plaintiffs, all of whom were placed in out-of-state institutions as children, years ago, with the approval of the State, because no appropriate treatment programs were available in-state. For example, one plaintiff, Jason Goodhue, aged twenty-seven, "has a diagnosis of severe mental retardation, cerebral palsy, spastic diplegia,[3] functional scoliosis, statis [possibly *static* ] encephalopathy [4] and a seizure disorder. He uses a wheel chair which [he] is able to push independently, though his control is poor. He is nonverbal, understands simple commands and usually responds yes/no verbally to questions." Unsigned document on Letchworth Developmental Disabilities Services Office (DDSO) letterhead,[5] titled "90 Day Update for Transitional Funding," dated December 30, 1995, Pltf.Ex. 10.

1. Decisions in *Brooks v. Pataki*, 95–CV–2902, were reported as 908 F.Supp. 1142 and 908 F.Supp. 1157 (E.D.N.Y.1995). Those orders have been vacated and remanded by the Second Circuit, 84 F.3d 1454, 1996. The history of TCF in New York State is described in the first of these orders, 908 F.Supp. at 1144–45.

2. The Suffolk County withdrawal and the ensuing litigation, 96–CV–0288, was the subject of two orders by this court, reported as 921 F.Supp. 970, (E.D.N.Y. April 2, 1996) and 924 F.Supp. 431, 1996 WL 239345 (E.D.N.Y. April 26, 1996). In the first, the County was ordered to fund plaintiffs' placements for a period of six months from the date of the order and to pay the arrears from the termination of its financial support on December 31, 1995 to the date of the order. The State defendants were ordered to assume full funding thereafter if any of the plaintiffs remained in out-of-state placements. In the second, Suffolk County's request for a stay of the order for payment of the on-going costs of plain-tiffs' placements was denied, although its request for a stay of the order to pay arrears was granted, subject to plaintiffs' right to renew upon a showing that the payment was required to maintain the status quo. The order was clarified to require the State defendants to pay current costs of plaintiffs' care should the County defendants prevail on appeal. Subsequent to these orders, the Second Circuit granted the Suffolk County defendants a stay and expedited their appeal.

3. Defined as "paralysis of like parts on either side of the body," in Miller–Keane, *Encyclopedia & Dictionary of Medicine, Nursing, & Allied Health*, 5th ed. (1992).

4. A degenerative disease of the brain, with the modifier "statis" possibly indicating that the degeneration is currently stayed in its progress. *Id.*

5. Letchworth DDSO is a local office for Westchester County of the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD).

Nearly six years ago this plaintiff "aged out" of his educational placement, that is, at the end of the school year in which he became twenty-one, he became ineligible for educational funding.

Westchester County asserts that Stephen Goodhue, Jason Goodhue's father, rejected an available placement in a letter dated September 9, 1995 to Carole R. Touzalin, Director of Clinical Services for Community Based Services, Inc. (CBS). Giuliano Aff. ¶¶ 5–6. In fact, the letter submitted was one, and certainly not the last, of a series of letters exchanged between Mr. Goodhue and Ms. Touzalin and others in the long-drawn-out process of arranging an appropriate new placement for Jason Goodhue. In the letter which the County now chooses to interpret as a rejection of an available placement, Mr. Goodhue, who observed that he had read an article that stated, " '[t]he group home system in the state of New York has, for the foreseeable future shut down,' " told Ms. Touzalin that "it is in the best interest of our son, Jason, that he remain at the Melmark Home where he has resided for the past twenty-three years...." However, this was not the end of Mr. Goodhue's correspondence with Ms. Touzalin nor did it represent the rejection of an available placement.

Plaintiffs have submitted a series of letters regarding CBS evaluation of Jason Goodhue and proposal of a placement for him in a CBS facility. The following chronological summary provides the context for the single statement to which the County now assigns such significance.

June 13, 1995 Ltr. from Touzalin to Melmark School official requesting information about Jason and asking Melmark to "inform the family so we can ascertain if they are interested in an alternate placement for Jason." Pltf.Ex. 17.

June 23, 1995 Ltr. from Goodhue to Touzalin, requesting a meeting "to discuss your facilities, share with you Jason's medical and personal history, and visit one or more of your group homes." Pltf.Ex. 18.

June 28, 1995 Ltr. from Touzalin to Goodhue, describing "the possibility of opening an additional group home in Westchester County" that might "open up spaces in a few areas" so that "Jason might fit nicely into our group home into our group home ... [in] Buchanan, NY." Ms. Touzalin also notes that CBS had "not received the final go ahead that would enable us to purchase property." Pltf.Ex. 19.

July 25, 1995 Ltr. from Olveira (County Case Manager) to Goodhue belatedly notifying him of Jason's referral to CBS that had been made in June. Pltf.Ex. 20.

September 9, 1995 Ltr. from Goodhue to Touzalin, expressing "decision that it is in the best interest of our son, Jason, that he remain at the Melmark Home where he has resided for the past twenty three years," but also stating that he hopes to visit the CBS facility in Buchanan in October. Pltf.Ex. 22.

September 25, 1995, Ltr. from Olveira to Goodhue, warning Goodhue that a refusal of a placement would mean that "transitional funding will not take over the financial responsibility of keeping Jason at Melmark Home." Olveira also stated: "As far as this Department is concerned your son has been formally accepted into Community Based Services, and the bed will be available in the near future." Pltf.Ex. 23. This latter statement by Olveira is astonishing: CBS had not yet reviewed Jason's records nor, apparently, yet purchased the home that would become a new facility and, when occupied by existing CBS clients, create vacancies in existing facilities, one of which might be suitable for Jason Goodhue.

November 30, 1995 Ltr. from Touzalin to Goodhue, notifying him that Jason had been accepted for placement "sometime in 1996." She also noted a meeting with Goodhue and his wife and invited them to see the facility "after the holidays." She further noted interest in meeting Jason. Pltf.Ex. 24.

December 21, 1995 Ltr. from Goodhue to Touzalin, providing a contact for a CBS visit to Jason at Melmark Home and accepting an invitation to visit the Buchanan facility for which Goodhue notes the availability of placement is from six to nine months in the future. Pltf.Ex. 25.

January 19, 1996 Ltr. from Touzalin to Goodhue noting "that it has been a long drawn out process, and hop[ing] that you remain interested." Pltf.Ex. 26.

February 10, 1996 Ltr. from Goodhue to Touzalin, noting that Goodhue had visited the Buchanan facility, inquiring whether CBS had visited Jason at Melmark, and indicating that while he sought to assure that Jason's best interest were served, he was still interested. Pltf.Ex. 27.

May 7, 1996 Ltr. from Frederick Zazycki, Director, Letchworth DDSO, to Goodhue, copies to, inter alia, Touzalin, indicating that the CBS placement "is projected to be available no later than December 31, 1996." Pltf.Ex. 14.

As this history indicates, the placement about which Mr. Goodhue and Ms. Touzalin corresponded had, as a prerequisite to availability, the development of another group home by CBS to which some of an existing facility's current residents would be transferred, creating, in turn, a vacancy that might be appropriate for Jason. This process was clearly enunciated in the June 28, 1995 letter from Ms. Touzalin to Mr. Goodhue:

> We have been told to screen individuals for placement, but have not received the final go ahead that would enable us to purchase property. When this approval comes through we would open a small home for six individuals, but would move residents from our current homes into the new site. This would, however, open up spaces in a few areas.

Pltf.Ex. 19.

The most recent indication of availability of this placement for Jason Goodhue in a CBS facility "is projected to be available no later than *December 31, 1996*," according to the May 7, 1996 letter to Mr. and Mrs. Goodhue from Frederick Zazycki, Director, OMRDD Letchworth DDSO. Pltf.Ex. 14. (Emphasis added.)

Intervening correspondence submitted by the plaintiffs indicates that Mr. Goodhue continuously maintained contact with CBS, visited the facility and indicated interest in the possible placement. There is no indication that either the County or the agency ever viewed his reservation of judgment on the appropriateness of a somewhat hypothetical placement for his wheelchair-bound and non-verbal son as a rejection. The County case manager, Maria T. Olveira, wrote Mr. Goodhue on September 25, 1995, replying to his "concern about the possibility of this placement not coming through," by stating a rather exaggerated view of the status of a placement offer: "As far as this Department is concerned your son has been formally accepted into Community Based Services, and the bed will be available in the *near future*." Pltf.Ex. 23. (Emphasis added.) The letter also warned Mr. Goodhue that a refusal of the offer would mean the end of TCF funding for Jason at Melmark Home.

It is, however, clear that, as of the present, Mr. Goodhue has not spurned any placement nor that any placement has been offered by CBS that has been actually available. What is not clear is how, from this factual basis, the County drew the conclusion regarding CBS' commitments with regard to Jason Goodhue's placement found in Maria T. Olveira's September 25, 1995 letter to Stephen Goodhue. As of the date of Ms. Olveira's letter, CBS had not met Jason and the Goodhues had not visited the proposed facility. In her November 30, 1995 letter, Ms. Touzalin of CBS wrote to Mr. Goodhue: "The proposed move would be to our group home in Buchanan, NY and would occur sometime in 1996. It *may take up to six months* to have everything in place, but I do want you to know of our decision, and to arrange a visit for you to see the Buchanan home right after the holidays." Pltf.Ex. 24. (Emphasis added.)

In sum, although the County asserts that "[u]pon information and belief, these individuals have maintained their TCF status not because of the unavailability of appropriate placements but instead because of the reluctance of their parents or guardians to accept such placements," Giuliano Aff. ¶ 6, the full context of the situation reviewed above paints a quite different picture. As Ms. Touzalin noted with respect to Jason Goodhue, placement of a TCF recipient is "a long drawn out process." Pltf.Ex. 26, January 19,

1996 Ltr. from Touzalin to Goodhue. In the same vein, plaintiffs have also submitted a May 7, 1996 letter from Letchworth DDSO Director Zazycki notifying another plaintiff that a proposed placement "is expected to have a vacancy no later than December 31, 1996." Pltf.Ex. 15.

### (b)

Another plaintiff, Ricardo Silvera, twenty-nine years old, is no longer in out-of-state placement. He was transferred from an out-of-state placement at the Woods School in Langhorne, Pennsylvania, to the Livingstone Avenue Facility of Abbott House in New York State on February 3, 1996, shortly after the effective date of the County's withdrawal from TCF funding. In addition to his constitutional claims under 42 U.S.C. § 1983, he and his parents have raised pendent state tort claims against the County for his injuries and the impairment of his rehabilitation that resulted from that transfer, as well as for indemnification for damage claims that may be raised against him and his parents.

Ricardo Silvera's disabilities were described as follows in a document on Westchester DDSO letterhead titled "90 Day Update for Transitional Funding," dated October 31, 1995, Pltf.Ex. 11:

> Ricardo functions in the severe range of mental retardation. He has been diagnosed with Down's Syndrome and Organic Personality Disorder. He has alopecia,[6] thyroid dysfunction and testicular atrophy. He has a bilateral hearing loss and limited language acquisition. Ricardo communicates through sign, gestures and vocalizations. His receptive language skills are good. He is able to understand and respond to complex commands. He is self toileting with supervision and performs other self care tasks with verbal prompts. There has been aggressive behavior addressed with a behavior plan. Behaviors have included grabbing, kicking, hitting, hair pulling, throwing objects, throwing excrement and urinating on others.

Plaintiffs allege that County defendants' precipitous withdrawal from TCF and improper transfer planning, including the absence of opportunity for his parents to visit the facility prior to his transfer, resulted in serious injury to Ricardo Silvera and his parents. "Ricardo Silvera violently reacted to the change of residence.... [H]e attacked an autistic resident, pulling his hair; destroyed furniture; vomited all over himself, and was otherwise unmanageable, requiring restraint by two staff members." Compl. ¶ 77. The complaint alleges that the facility notified his father that he "would be sent to the psychiatric ward of White Plains Hospital unless he was picked up at once. They added that there was insufficient staff to deal with Ricardo's outbursts." After Ricardo spent the remainder of that day and evening with his father, the next day the facility received Ricardo again. Plaintiffs assert that "staffing was increased" at the facility at the time of Ricardo's readmission. Compl. ¶ 78–79.

### (c)

These descriptions indicate the severity and complexity of Jason Goodhue's and Ricardo Silvera's disabilities that were the very reasons for their educational placement out-of-state initially, and for their remaining in out-of-state placements long after they were no longer eligible for educational placement. TCF was utilized by New York State and its localities for particularly hard-to-place disabled adults. The plaintiffs, other than Ricardo Silvera, remain in the out-of-state placements where they had been placed with State approval when they were children because, through no fault of their own, the State has been unable to place them in in-state facilities.

After oral argument, the County submitted conclusory affidavits from persons without direct knowledge of on-going placement efforts for plaintiffs, the nature of their requirements and the availability or appropriateness of the "proposed" placements. For example, the County's affiant Salem addressed only the cost of TCF. County affiant Giuliano qualifies his statement regarding plaintiffs' rejection of placements as being "[u]pon information and belief," ¶ 6, and presents an interpretation of what

---

**6.** Loss of hair.

constitutes an appropriate placement offer that is rendered unworthy of belief in the light of the materials submitted by the plaintiffs.

### 2. Notice of Termination of Transitional Care Funding

Arguing that it provided notice to the plaintiffs in the summer of 1995, the County has submitted letters sent to the plaintiffs that stated:

As you might be aware, Transitional Funding of individuals with developmental disabilities, placed in residential schools, *will be ending.* In an effort to insure that your child's residential needs are met, the Westchester County Department of Community Mental Health and the Letchworth Developmental Services Office have made referrals to community based agencies.

Our office received verbal notification that your child has been accepted for residential placement into [facility name].

We are notifying you at this time, so that you can begin the planning process with [facility] to arrange for the most appropriate services for your child.

Ltrs. to four of six plaintiffs' parents, attached to County Brf. dated May 3, 1996. A fifth letter, to Mr. Goodhue, was described above. The County submitted no letter to the parents of plaintiff Eiseman.

The notice which fails to indicate any date on which TCF will end was ambiguous and permitted interpretations other than the precipitous cessation of funding which occurred on January 31, 1996, particularly as the proposed "placements" were, at least in plaintiff Goodhue and Eiseman's cases, not available at that date and, in fact, are still not available, according to OMRDD's local office, as of the date of this order. Plaintiffs were first notified that funding would cease on January 31, 1996 only in a letter dated November 30, 1995 from Commissioner Glass of the County Department of Social Services. Pltf.Ex. 8. This letter, however, included a misleading assurance that "since this is only a matter involving a funding relationship between the State and the County, your child's current placement will not be disrupted."

Woods School disabused parents of its Westchester County TCF recipients that their children's placements would not be disrupted by writing, on December 6, 1995:

While Woods wishes to extend every cooperation to the families of affected clients, we are unable to provide services without compensation. Consequently, you might wish to consider contracting with Woods to provide residential care on a private payment basis. If private funding is not feasible, I must request that you arrange an alternative placement for [your child] by January 31, 1996.

Pltf.Ex. 12.

Plaintiffs moved for a preliminary injunction on March 19, 1996. Plaintiffs submitted a brief, a marshaling affidavit by their attorney, an affidavit from a plaintiff who is also the father of one TCF recipient and a book of exhibits, setting the date of March 29, 1996 for the County's reply.

The Westchester County defendants obtained extensions from the plaintiffs and cross-moved on April 15, 1996 for dismissal under Rules 12(b)(6), for failure to state a claim upon which relief can be granted, and 12(b)(3), for improper venue. In the alternative, the County defendants moved to transfer venue under 28 U.S.C. § 1404(a). With their motion, the County defendants submitted a memorandum of law in reply to the plaintiffs' motion and, in support of their motion, an attorney's affidavit.

The plaintiffs replied to the County defendants' memorandum of law and replied in opposition to the County's cross motion on April 22, 1996 and filed the motions and briefs on April 25, 1996. The County defendants submitted a reply to the plaintiffs' memorandum of law after the close of business on May 3, 1996, attaching copies of letters from the County Department of Social Services to some of the plaintiffs, sent in the period from July–September 1995, along with another attorney's affidavit. Prior to oral argument on May 6, 1996, the County defendants submitted no affidavits from anyone with knowledge of the facts.

Plaintiffs have agreed to the State defendants' request for an indefinite extension of

their time to answer. The State defendants submitted a letter, dated April 26, 1996, in opposition to the argument reasserted by plaintiffs here, that the injunction issued in *Brooks v. Pataki* was determinative of the instant application for a preliminary injunction, incorporating by reference arguments the State had advanced against a similar claim in the Suffolk County action. The State also requested that the court, should it grant the County defendants' request to transfer the action against the County, transfer the entire action.

Oral argument on the plaintiffs' and the County's motions was presented on May 6, 1996. The court granted County Defendants permission to submit factual affidavit(s) by close of business May 10, 1996. Plaintiffs submitted affidavits and related correspondence in reply on May 15, 1996.

### Legal Issues

This case presents, in most respects, as the County's counsel essentially conceded at oral argument, the same issues as were presented in *Suffolk Parents*.[7] May 6, 1996 Tr. at 27. None of the res judicata issues in *Brooks v. Pataki*, the case arising from New York City's withdrawal from TCF, are present.[8] All of the plaintiffs are severely disabled adults who were placed in out-of-state placements when they were children. These placements of the Westchester County plaintiffs, like those in Suffolk County and in New York City, were made only with State approval following rejections at five in-state institutions. The plaintiffs remained in these placements under TCF, a joint State-local program, after they became twenty-one and were no longer eligible for federal educational funding because suitable in-state placements were not made available by the State. *See Brooks v. Pataki*, 908 F.Supp. at 1143–45

for a description of the origins of out-of-state educational placement of TCF recipients and the development of the program.

With one exception, plaintiffs still remain in these placements. Plaintiff Ricardo Silvera transferred from out-of-state placement two days after the Westchester County funding for his out-of-state placement terminated. As noted above, he and his parents have asserted claims in connection with injuries suffered as a result of the allegedly precipitous transfer. The remaining TCF recipients' out-of-state care providers have been without payment since January 31, 1996, the effective date of the Westchester County withdrawal from the program.

The notable exception to the commonality of legal issues in the Suffolk and Westchester County actions is that Westchester County challenges the venue of this litigation in the Eastern District of New York, asserting that venue is properly laid only in the Southern District of New York. As the issue of venue is, of course, a threshold consideration before the court can consider the applicability of the reasoning of the Suffolk County order in connection with these plaintiffs' motion for a preliminary injunction, it will be analyzed first. Finding venue appropriately laid in this district, the County's request for transfer will be analyzed next. Finding transfer unwarranted, the plaintiffs' motion for a preliminary injunction has been considered and is granted against both County and State defendants. However, in view of the Second Circuit's grant of a stay of the order with respect to Suffolk County, the order is stayed with respect to Westchester County. The State did not request a stay with respect to the order in the Suffolk County matter, and thus, no stay is granted to the State.

7. Although the County asserted that "a different factual scenario" was presented by the notice provided by Westchester County in its summer 1995 letters to plaintiffs, this is a distinction without a difference. Suffolk County provided far clearer notice to those plaintiffs that the Executive was once again attempting to eliminate funding for TCF for the coming budget year than Westchester County did.

8. In *Brooks v. Pataki*, a final judgment in a collateral action in state court that, inter alia, challenged the City's withdrawal from TCF but failed

to raise constitutional issues, foreclosed consideration of the City's liability to the plaintiffs. *See* 908 F.Supp. 1142, 1156 (E.D.N.Y.1995). The Second Circuit, in its decision vacating and remanding *Brooks*, relied substantially on res judicata in its decision, although it also held that "an expressed intent to provide assistance, or even a failed initiative to do so" did not establish "a duty to 'exercise professional judgment' under *Youngberg* and *Society for Good Will ...*" *Brooks*, 84 F.3d 1454, 1465 (2d Cir. May 31, 1996).

## 1. Venue Is Properly Laid in the Eastern District of New York.

Venue in litigation based on a federal question is spelled out in 28 U.S.C. § 1391. The section relevant here, § 1391(b)(1), provides, in pertinent part, that: "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State." [9]

■ The State defendants have accepted venue in the Eastern District for the purposes of this suit. Abramowitz Ltr. dated April 26, 1996. Even if this court did not represent a proper venue for the action against the State defendants, their waiver establishes the propriety of venue with respect to them. The Second Circuit, in *Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 (1966), citing *Olberding v. Illinois Cent. R. Co.*, 346 U.S. 338, 340, 74 S.Ct. 83, 85, 98 L.Ed. 39 (1953), stated: "The standards of 28 U.S.C. 1391 (1964 ed.) are 'not a qualification upon the power of the court to adjudicate, but a limitation designed for the convenience of litigants, and, as such may be waived by them.'"

■ Nonetheless, acceptance of venue by the State does not, of itself, dispose of the County defendants' challenge to venue. It is still necessary to determine whether the State "resides" in the Eastern District, within the meaning of § 1391(b)(1), so that venue is properly laid here, in view of the undisputed fact that the County defendants do not reside in the Eastern District. Over the past fifty years there have been several modifications of the rules governing venue for federal question cases, as well as for those in diversity.[10] Most pertinent to this action are the changes made in 1990. The 1990 modification eliminated the plaintiffs' residences as a basis of venue, as well as the requirement that the district be one in which "*all*" defendants resided. The current provision relevant here permits venue "where *any* defendant resides, if all defendants reside in the same State." [11] Wright, Miller, 15 *Federal Practice and Procedure* § 3802 (Pocket Part 1996).

The precise issue presented here is: for venue purposes under § 1391(b)(1), do officials of State government subject to suit in their official capacity, under case law that analogized suit against State officials to that against the Federal officials,[12] reside only in

---

9. Plaintiffs make no serious effort to premise venue on 28 U.S.C. § 1391(b)(2), a provision that authorizes venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Plaintiffs concede, aside from a brief reference to open placement offers at facilities located in the Eastern District, that the events and the omissions that gave rise to the claim occurred primarily in the Southern District, and not in the Eastern District. No named plaintiff resides in the Eastern District. Pltf. Reply Brf. at 19.

10. 15 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3802 (1986), note that "significant changes [came] in 1962, when venue was liberalized in suits against federal officers and agencies, and in 1966, when Congress, generalizing from a provision that had been adopted three years earlier for automobile accident cases, provided that the district 'in which the claim arose' is now a permissible alternative venue both in diversity and federal question cases." In the 1996 Pocket Part to this same volume, § 3802, the authors note that the significance of divisions within a district was eliminated by a 1988 amendment and a wholly new statutory provision was adopted fixing venue in suits against corporations, "deem[ing] a corporation to reside in any

judicial district in which it is subject to personal jurisdiction at the time the action is commenced," and, in states where, as in New York, there are multiple districts, "such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State."

11. The 1990 amendments also clarify "[t]he implication that there can be only one ... district [in which the claim arose]," substituting the "substantial part" language now found in § 1391(b)(2). *Id.* The authors note that this modification to § 1391(b)(1) has "render[ed] § 1392(a)] superfluous." *Id.* § 1392(a) provides: "Any civil action, not of a local nature, against defendants residing in different districts in the same State, may be brought in any of such districts."

12. *See Neville v. Dearie*, 745 F.Supp. 99, 102 (N.D.N.Y.1990) ("[C]ourts have uniformly held that federal officers can have only one official residence for purposes of venue.") (Collecting cases.). 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3815, note that this "unsatisfactory" doctrine had developed from

the district in which they are "officially" resident or may they be residents of any district in their state when they have no objection to venue? No case exactly on point with the situation here has been presented by the parties or located in the court's research.

With the 1988 elimination of a restriction on venue based on division in single district states, officials of State government are subject to suit in every federal courthouse in a single district State. Another change in 1988, perhaps applicable by analogy, eliminated the restriction of venue over a corporation to where it was incorporated or "licensed to do business," substituting language permitting an action to be laid "in any district in [a] state within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." § 1391(c). Some, at least, of the State defendants would be subject to personal jurisdiction on the basis of doing business in the district, were they corporate agents.

The issue here arises because, based on an analogy to venue against a federal official, case law developed that limited venue for suits against a State official to the district in which the state official had his or her "official residence." (As a starting point, in New York, the State defendants are officially resident in the Northern District, in which the state capital, Albany, is located.)

An example of reasoning from the federal government analogy is found in *Procario v. Ambach,* 466 F.Supp. 452, 453 (S.D.N.Y. 1979), in which Judge Goettel held that, as "all official decisions and business pertinent to this action occur in Albany, New York," venue was appropriate only in the official residence of all the defendants, "find[ing] no persuasive arguments for treating state officials differently from their federal counterparts." *Id.* at 454. Another example is provided in *Andrew H. v. Ambach,* 579 F.Supp. 85, 89 (S.D.N.Y.1984), in which Judge Gagliardi held that "[w]here, as here, public officials are sued in their official capacities, 'residence' for venue purposes is where they perform their official duties," citing *Birn-*

the Supreme Court decision in *Kendall v. U.S. ex rel Stokes,* 12 Pet. (37 U.S.) 524, 9 L.Ed. 1181

*baum v. Blum,* 546 F.Supp. 1363, 1366 (S.D.N.Y.1982). The rigidity of the venue privilege granted to officials of state governments, otherwise working in their often numerous offices throughout the state, has prompted the creation of exceptions to this rule. Courts have found there were persuasive arguments for holding other venues to be appropriate. In *Buffalo Teachers Federation, Inc. v. Helsby,* 426 F.Supp. 828, 829 (S.D.N.Y.1976), Judge Frankel acknowledged the "obvious problem of forum shopping if suits could be brought in any district where a [Federal] subordinate departmental officer resides ... [but] [s]uch problems are significantly less serious in the context of a suit against a state governmental entity or official," and could "be relieved by discretionary transfers under 28 U.S.C. § 1404(a)." Judge Frankel also observed that there were "several alternative bases for venue ... available in suits against federal officers and agencies, but not in suits brought against state officials." *Id.*

Thus, in a number of cases, the State of New York has been found to be resident in a district other than the Northern District of New York, its official residence at the state capitol on the basis of additional "official residences." For example, in *Buffalo Teachers,* 426 F.Supp. at 830, Judge Frankel premised venue on the facts that "PERB [the state agency whose members had been sued] maintains an official office in New York City and ... a significant portion of PERB's business is conducted in that office."

In *Buffalo Teachers,* the court enunciated no requirement of a nexus between state activities in the district and plaintiffs' cause of action. Indeed, it did not even discuss whether there were any transactions in the District by State defendants that concerned the plaintiffs. In *South Ogden CVS Store, Inc. v. Ambach,* 493 F.Supp. 374, 377 (S.D.N.Y.1980) (Conner, J.), venue was held to be proper in a district "when an agency or officials sued in their official capacities maintain more than one office in which a substantial amount of business is done, ... in any

(1838).

district in which such an office is located," following *Buffalo Teachers*. *Buffalo Teachers* was among the cases cited in *St. Regis Mohawk Tribe v. State of New York*, 774 F.Supp. 185, 186 (S.D.N.Y.1991) (Wood, J.), for the finding: "The weight of authority is to the effect that a state official may have more than one residence for venue purposes when she conducts a significant amount of government business in both locations."

However, other cases subsequent to *Buffalo Teachers* have created an exception to its exception, disallowing venue where the business conducted by the State defendants in the district is limited or is unrelated to the plaintiffs' claims, essentially adding a requirement of a nexus between the claim in order to find venue in the district appropriate against State officials. In *Andrew H. v. Ambach*, 579 F.Supp. 85 (S.D.N.Y.1984) (Gagliardi, J.), the court, while noting that "[t]here is some authority for [the] view that when a state agency maintains a 'secondary' or 'satellite' office in which a significant portion of business related to the litigation is conducted, agency members may have more than one official residence," it held that venue would still not lie in the Southern District because of the then-applicable requirement that the suit be brought where *all* defendants reside. The *Andrew H.* decision refused to permit plaintiffs to utilize the escape clause of § 1392(a), permitting suit in a district where one defendant resides when defendants reside in different districts in the same state, because there was a district in which *all* defendants resided.

A three-part test that incorporated such a claim nexus requirement was proposed in *Cheeseman v. Carey*, 485 F.Supp. 203, 207 (S.D.N.Y.1980) (Sofaer, J.), remanded for other reasons, 623 F.2d 1387, 1391 (2d Cir. 1980), for determining whether a state defendant could be found to reside in the district in which plaintiff brought suit: "(1) the defendant's presence in the district in which the plaintiff has sued; (2) the extent of defendant's official activities in the district; and (3) the relationship of the defendant's activities within the district to the cause of action asserted," citing *Procario* for the third factor, noting that it was not clear if the factor

had been met in *Buffalo Teachers*. (In fact, given the lack of reference to such relationship in that opinion and the Northern District location of the plaintiffs, it seems unlikely that the requirement was met in *Buffalo Teachers*.)

In 1990, § 1391(b)(2) was amended so that, ten years after the *Cheeseman* decision was rendered, the third *Cheeseman* factor may no longer be applicable. It seems possible that the *Cheeseman* requirement of activities by the State defendant(s) within the district that are related to the plaintiff's cause of action was the result of Judge Sofaer's view that a claim could arise in only one district. He held that it was "inconsistent with the plain meaning of the statute" to interpret the then-statutory language of § 1391(b)(2), "the district ... in which *the* claim arose....," to mean that "that suit may be brought in *any* district in which substantial contacts relating to the claim [exist]." (Emphases added.) *Cheeseman*, 485 F.Supp. at 211. The 1990 amendment explicitly authorized suit in any district "in which a substantial part of the events or omissions giving rise to the claim occurred," rejecting the doctrine upon which Judge Sofaer relied, that a claim may arise in only one district.

The Westchester County defendants have cited a number of cases that have, subsequently, utilized the third *Cheeseman* factor, the relationship of the defendant's activities in the district to the plaintiff's claim. Judge Glasser, in *Boston Drugs, Inc. v. Perales*, 747 F.Supp. 873, 875 (E.D.N.Y.1990), held that venue was proper against the State Commissioner of Social Services because "[the Commissioner's] Queens office apparently plays an active role in the relevant decision-making processes." He distinguished the facts in that case from those that led him to find venue improper in another case against the same state commissioner, *Canaday v. Koch*, 598 F.Supp. 1139 (E.D.N.Y.1984), where Commissioner Perales' only connection to the facts at issue was his agency's supervisory responsibilities over the City agencies involved.

In another case propounding a restrictive interpretation of the venues in which the State is amenable to suit, *Berry v. New York*

*State Dep't of Correctional Serv.,* 808 F.Supp. 1106, 1109 (S.D.N.Y.1992) (Motley, J.), a nexus requirement was also imposed. The *Berry* court acknowledged that "[w]hile a state defendant may have more than one official residence due to having branch offices where substantial amounts of official business are conducted, their (sic) residence for purposes of 1391(b) is one of these official residences." Nonetheless, it held that venue was only appropriate in the districts where the activities occurred on which the suit was based. Its finding that there was no defensible basis for the plaintiff's selection of the Southern District, "where a regional arm of the State is being sued for activities which took place entirely outside the venue sought," because "the great majority of relevant evidence is most likely located in the Northern or the Western District," may have been determinative. In this vein, the court noted that even if it had held that "venue was proper in the Southern District, [it would have transferred the case because] trial elsewhere would be far more convenient for parties and witnesses." *Id.* at 1110–11.

However, as noted above, the court in *St. Regis Mohawk Tribe,* 774 F.Supp. at 186, held that venue was appropriate in the Southern District because the State "defendants reside in this judicial district," without requiring a nexus between the plaintiffs' claim and the State defendants' activities within the district. The *St. Regis Mohawk Tribe* decision illustrates how the absence of such a nexus, although it does not render venue invalid under the current rule, is relevant, among other factors, in consideration of a transfer request. The *St. Regis Mohawk Tribe* court exercised its jurisdiction and denied State defendants' motion to dismiss for improper venue, but then granted the State defendants' motion to transfer the case under 28 U.S.C. § 1404(a).

The conclusion may be warranted that a privilege for state officials with regard to venue is an anachronism after the 1988 and 1990 statutory amendment of the venue rules, as that privilege developed under statutory venue schemes no longer in effect. Hardship to state officials from the plaintiff's choice of district for suit with respect to the production of witness and documentary proof can be remedied by transfer of venue pursuant to 28 U.S.C. § 1404(a), a process presumably similar to that by which cases are transferred to different courthouses within districts in a single district state.[13] For instance, with respect to transfers to the Long Island courthouses of the Eastern District of New York, the local rule provides: "a party may move to designate a case as a Long Island case or to cancel such designation on the grounds that such action will serve the convenience of the parties and witnesses or is otherwise in the interests of justice." E.D.N.Y. Guidelines for the Division of Business R. 50.1(d)(3).

However, here the issue of whether there is any remaining basis under current venue rules for special limitations with regard to venue against State defendants need not be reached, because the State officials have declined to assert any possible privilege with respect to venue. All of the State defendants have waived their possible privilege under this body of case law to be deemed nonresidents of the Eastern District. Here, the State defendant Thomas A. Maul, OMRDD Commissioner, has a substantial official presence in this district and thus, in his official capacity, "resides" in the Eastern District.[14] As § 1391(b)(1) requires only one resident defendant in the district, it is not necessary to inquire with respect to the others.

In an alternative view of the State defendants' waiver of their possible privilege with respect to venue, the provisions of the venue

---

**13.** It is interesting that, in half, that is, in twenty-six of the fifty-two jurisdictions in which there are district courts, (the fifty states plus the District of Columbia and Puerto Rico), a State is resident throughout its territory and is thereby subject to suit in any location in which a district courthouse is located. The limitation on venue based on divisions within a district was eliminated in 1988, reducing the analysis to one of forum

convenience. 15 Wright, Miller & Cooper, § 3802 (Pocket Part 1996).

**14.** The 1994–95 [New York City] Green Book lists OMRDD Developmental Disability Service Offices in Brooklyn, Queens, and Staten Island. The Suffolk County telephone book lists an OMRDD office in Hauppauge, which was of relevance in the Suffolk County litigation.

statute applicable to a corporation might appropriately be applied by analogy to the State defendants. "[A] corporation shall be deemed to reside in any district in [the] State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(c). As noted above, the agency of State defendant, Commissioner Thomas Maul, OMRDD, has at least four offices within the Eastern District and thus he would be subject to personal jurisdiction in his official capacity at each, on the basis of presence in the district, were the district a separate State. Thus, clearly, under this test as well, were he a corporate agent sued in his official capacity, he would "reside" in the Eastern District for the purposes of the venue provision.

For the foregoing reasons, because at least one State defendant is a defendant resident in the Eastern District, venue may properly be exercised over other defendants resident in other districts also located in New York State. Therefore, this action was properly brought here against the Westchester County defendants, Westchester County, its Executive, Andrew P. O'Rourke, and its Commissioner of Social Services, Mary E. Glass.

## 2. The Interests of Justice Weigh Against Transfer

■ Although, based on the foregoing analysis, venue may be properly exercised in this district, the County's request for transfer must also be considered. Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no question that plaintiffs might have brought this suit in the Southern District. However, when one compares the Manhattan and Brooklyn courthouses, the distance between the districts is less than two miles, and, when the White Plains and Brooklyn courthouses are compared, it is less than thirty miles. The latter distance is comparable to the distance between the Brooklyn and Hauppauge courthouses within the Eastern District.

The State has indicated that Brooklyn is just as convenient a location for it as is White Plains; plaintiffs selected this location; and no issues of fact must be resolved before deciding the plaintiffs' motion for a preliminary injunction. The Court permitted the County defendants to provide affidavits of fact following oral argument and neither these nor their submissions before the argument have raised any material issue of fact to the determination of the plaintiffs' motion nor, as the foregoing analysis demonstrates, to determination of the County defendants' cross-motion for change of venue or transfer.

Further, plaintiffs' situation is urgent as their care-providers have not been paid for nearly five months. Unless the status quo is assured, plaintiffs will have lost the object of their suit before they have had an opportunity to present their case. As Judge Walker, when sitting in the District Court, stated, in *Sharif v. New York State Educ. Dep't,* 709 F.Supp. 345, 358–59 (S.D.N.Y.1989), finding venue appropriate, "[t]he Southern District is at least an equally plausible forum,"

> because speed of disposition is important in this case, the interests of justice weigh against a transfer. This Court is familiar with the detailed facts of the case, and substantial proceedings have already occurred before this Court. This is not a case where plaintiffs may have chosen their place of venue to harass defendants or to avoid [adverse] precedents in the [Southern] District.

Here, too, the interests of justice weigh against transfer. While, here, "the substantial proceedings" have been conducted in the other TCF cases, these proceedings and the documentation provided by the parties to these other cases, much of which is applicable here, have permitted this court to develop a substantial understanding of the TCF program and of the process constitutionally required to bring TCF recipients back to placements in New York State. TCF was a state-wide program monitored by the State under state-wide standards. TCF recipients were placed out-of-state as children only with the approval of the State Department of Education after no institutional placement within the state could be located. In the urban

counties seen in these suits, no local factors distinguishing their TCF recipients from others state-wide have been asserted by the local defendants and local factors are not likely to be determinative. The Westchester County defendants dispute the court's conclusions of law, not its findings of fact.

Nor have plaintiffs brought suit in this district to harass the County defendants. The distance is not extraordinary—Suffolk County is located at a comparable distance from the Brooklyn courthouse—and the commonality of issues with the other TCF cases reduces the cost of litigation for all parties. The State defendants' waiver of their own potential objections to venue attests to the non-harassing quality of the chosen venue.[15]

### 3. Equal Protection Violated by TCF Program

In *Brooks,* because of the res judicata effect of the prior state litigation of plaintiffs' rights under TCF, the equal protection violation inherent in the State's denial of rights to out-of-state TCF recipients that it granted to other institutionalized mentally retarded and developmentally disabled persons, including in-state TCF recipients, was alluded to but could not form the basis of that order. This was acknowledged by the Second Circuit in its *Brooks* decision, 1996 WL 285441 at *10:

> The first four claims raised in plaintiffs' amended complaint, alleging denial of procedural due process, substantive due process and equal protection, are completely barred by *res judicata,* because the underlying factual predicate for each of these claims—which concern the TCF reimbursement mechanism, the TCF Statute, the City's termination of transitional care, and the plaintiffs' resulting predicament— is substantially identical to the allegations presented in state court.

As noted, the issue of whether the TCF withdrawal provision was constitutionally defective could not be reached in *Brooks v. Pataki* because of the res judicata effect of the judgment in New York State Supreme Court in the suit brought by the *Brooks*

plaintiffs. It, therefore, was not considered by the Second Circuit in its vacating and remand of that decision. The State court result is also not binding in this case except with respect to its determination of the meaning of the New York State law. Thus, res judicata presents no bar to the consideration of the equal protection claim here and will be considered.

■ There are a number of ways in which out-of-state TCF recipients such as these plaintiffs were treated differently than other severely developmentally disabled adults institutionalized within the State, both under TCF and other State programs. The Supreme Court has recently summarized the difficult legal question presented by classification in state law:

> The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must co-exist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons. We have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.

*Romer v. Evans,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (Citations omitted.) (Holding that the Colorado state constitutional amendment violated the Equal Protection Clause of the Fourteenth Amendment by "imposing a broad and undifferentiated disability on a single named group ... inexplicable by anything but animus toward the class that it affects; it lacks a rational relationship to legitimate state interests.")

The Second Circuit has also laid out the analytic standard with respect to challenges to state legislation based on the Equal Protection Clause in *Quill v. Vacco,* 80 F.3d 716, 725–31 (1996), holding that New York's criminalization of assisted suicide while permit-

---

**15.** For these reasons, the court sought the County's consent for its designation by the Chief Judge of the Circuit as a Southern District court for the purposes of this case. The County, however, refused that consent by letter dated June 10, 1996.

ting those on life-support to hasten death violated the constitutional requirement that statutes treating similarly situated persons unequally have a rational basis:

> [I]t seems clear that: 1) the statutes in question fall within the category of social welfare legislation and therefore are subject to rational basis scrutiny upon judicial review; 2) New York law does not treat equally all competent persons who are in the final stages of fatal illness and wish to hasten their deaths; 3) the distinctions made by New York law with regard to such persons do not further any legitimate state purpose; and 4) accordingly, to the extent that the statutes in question prohibit persons in the final stages of terminal illness from having assistance in ending their lives by the use of self-administered, prescribed drugs, the statutes lack any rational basis and are violative of the Equal Protection Clause.

The differences imposed by New York State law on out-of-state TCF recipients will be described in detail in order to determine, using the test enunciated by the Second Circuit in *Quill,* whether these differences constitute a violation of the Equal Protection Clause.

One major difference is the TCF statutory provision that permitted a locality to make a decision that effectively discharges (or precipitously transfers) a TCF recipient without the slightest regard for protections otherwise extended to institutionalized mentally retarded and developmentally disabled persons under New York State law. In contrast, New York State law and regulations provide extensive protections for institutionalized men-

tally disabled persons in state operated or certified facilities. This category appears to include any type of residential facility of the type in which plaintiffs do or could reside as § 16.03(a) of the Mental Hygiene Law provides that:

> No provider of services shall engage in any of the following activities without an operating certificate . . . :

> (1) Operation of a residential facility for the care and treatment of the mentally retarded or developmentally disabled including a family care home.[16]

Persons institutionalized within State OMRDD operated or certified facilities, prior to effectuation of a proposed discharge or transfer, are entitled to a formal review process under state regulations, part of which is found in 14 N.Y.Comp.Codes R. & Regs. § 633, titled "Protection of Individuals Receiving Services in Facilities Operated and/or Certified by OMRDD." Section 633.12(a)(1), titled "Objection to and appeal of care and treatment," provides: "Adult persons, parents, guardians or correspondents, and the Mental Hygiene Legal Services, may object to and appeal any plan of services or part thereof and proposed changes thereto, other care or treatment with which they disagree, plans for placement . . ., or a proposal initiated by the agency/facility to discharge." The procedure for objection begins with an informal mechanism that is followed by, if no resolution of the objection is reached, submission of formal written objection and a hearing before a hearing officer who must issue a written decision. Thereafter, any party may appeal to the Commissioner of OMRDD who will issue a final written deci-

---

**16.** Nonetheless, the State has repeatedly asserted that, despite the very small number of in-state TCF recipients who appear to reside only in programs without an adult program: "The fact that [the TCF recipient's in-state program is] state approved does not give an individual who would have been in an in-state non-OMRDD facility any greater rights." Kietzman, June 6, 1996 Tr. at 10. The State would have the court accept that it is merely coincidental that in-state residential educational programs for severely developmentally disabled children turning twenty-one happen to provide programming for develop-

mentally disabled adults that OMRDD can "find" a basis to "certify" and thus bring former in-state educational placements funded under TCF under its regulations (and funding). A better reason than a conclusory assertion needs to be offered to meet even a rational relationship test. No claim was made by the State that certifying out-of-state beds would be a burden, and of course, the State Departments of Education and Social Services have set rates and otherwise certified the suitability of the out-of-state facilities during the entire period plaintiffs have resided in them.

sion. During the pendency of the administrative review, "relocation or discharge shall only take place with the Commissioner's approval." The Commissioner's decision may be appealed pursuant to Article 78 of the New York Civ.Prac.L. & R.[17]

Referring, it is presumed, to the regulations contained in 14 N.Y.Comp.Codes R. & Regs. §§ 633 and 686,[18] OMRDD officials have stated at status conferences that, in contrast to TCF recipients, persons institutionalized in-state have substantial protection against discharge and transfer, making no distinction between "community based facilities" and "developmental centers." For instance, a representative of OMRDD characterized the situation in the following manner:

"Before we can move anybody in our system, they're entitled to notice and an opportunity to be heard and the new placement has to be shown to be less restrictive, a better placement for them. There are *infinite rights* that we have in the State." Alan M. Adler, November 2, 1995 at 30. Adler, an attorney for OMRDD, subsequently characterized the difference between a TCF recipient and a "person in our system."

Once a person is in our system, we admit that we owe them minimal food, shelter, clothing. And if we don't meet that standard, we would agree that we would be violating the Constitution and the Court would have jurisdiction. In this case, these people are not in state custody and

17. In the Definitions section, § 633.99(ah), titled "Discharge," the regulations provide:

> By regulation, most facilities are required to have admission and discharge policies. As used in that context, discharge means the release of a person from a facility and the termination of programs/services at the facility.... However, "discharge" also takes place when a residential or day program facility determines, in conformance with its policies/procedures, that it can no longer provide programming/services, even if it has been incapable of making alternative provisions for programs or services. In this instance, objection to discharge shall be processed pursuant to Section 633.13 of this Part. In a developmental center, "discharge" (and conditional release) must also comply with the legal requirements of Article 29 of the Mental Hygiene Law, thereby terminating a person's "inpatient status."

Section 29.11(b) of the Mental Hygiene law provides: "A voluntary or informal patient may be transferred only with his consent."
Section 29.15(i)(2)(I) provides:

> A patient about to be discharged or conditionally released from an inpatient facility operated or licensed by an office of the department to an adult home or residence for adults, as defined in section two of the social services law, shall be referred only to such home or residence that is consistent with that patient's needs and that operates pursuant to section four hundred sixty of the social services law ...

Section 633.99(ah) of the Regulations notes, however, that the statutory protections provided by "Article 29 relative to legal admission or discharge" do not apply to persons in "community based facilities," but these facilities "can, therefore, establish their own criteria in conformance with applicable laws and regulations."

18. The facilities in which plaintiffs reside might perhaps, if they were not out-of-state, be appropriately considered "community based facilities,"

defined in 14 N.Y.Comp.Codes R. & Regs. § 686.99. If so, and the protections of Article 29 would not apply, 14 N.Y.Comp.Codes R. & Regs. § 686.6(a)(2)(ii), applicable to community residences, provides, in pertinent part, in addition to the applicable portions of the § 633 regulations:

> Each community residence shall develop and implement policies/procedures which address, at a minimum:
> (ii) Discharge, including at least:
> (a) The criteria for discharge of clients;
> (b) The requirement that, to avoid precipitous discharge, reasonable efforts are made on the part of the community residence to meet the needs of a client before a more restrictive placement is sought and/or discharge is contemplated, taking into consideration the needs of the other clients in the facility and the facility's available resources;
> (c) The procedures for being discharged, including the procedures governing discharge of a client against the recommendations of the program planning team; ...
> (e) The requirement that the program planning team participate in designing plans and the coordination of services for a client in the process of being discharged from the residence.

14 N.Y.Comp.Codes R. & Regs. § 633.10(a)(1) provides, under the title, "Care and treatment," that, "Section 33.03 of the Mental Hygiene Law requires that each client shall receive care and treatment that is suited to his or her needs and skillfully, safely and humanely administered with full respect of the client's dignity and personal integrity." Section 633.4(xxi), subtitled "Rights and responsibilities of persons receiving services," provides: "the opportunity to request an alternative residential setting, whether a new residence or change of room, and *involvement* in the decisions regarding such changes."

therefore we owe them no constitutional duties—"

*Id.* at 32.

The only reason that plaintiffs are not entitled to the protections of 14 N.Y.Comp. Codes R. & Regs. §§ 633 and 686 flow from the acts and omissions of the State that resulted in plaintiffs' out-of-state placement in residential facilities when they were children, in order to comply with the federal Education of the Handicapped Act (now titled Individuals with Disabilities Education Act (IDEA)), 20 U.S.C. § 1412. This Act required, as a condition of the State's receipt of its funds, that "a free appropriate public education be available … for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980. …" The State's initial failure, when plaintiffs were children, to accommodate them in appropriate in-state placements through use of the expedient of providing this education out-of-state, continued after they became adults, as the State failed to treat their out-of-state placements in the same manner as in-state placements with regard both to funding and to rights.

Although the State has repeatedly likened plaintiffs to disabled adults living at home for whom residential placement is sought, this analogy is not persuasive. Plaintiffs have not lived at home for many years—for example, plaintiff Jason Goodhue was placed at Woods School twenty-three years ago when he was four years old. Plaintiffs are adults who, in most cases, are capable of far more complex, possibly destructive, behavior and require care at a much higher level than when they last lived at home. The untoward consequences when Ricardo Silvera was transferred illustrate potential hazards. The State has recognized this in the priority given to relocating TCF recipients to in-state facilities and in converting in-state TCF placements to OMRDD "certified" status.

Abrupt cessation of funding will not leave these plaintiffs in the same position they are in, while denial of placement to disabled adults living at home does maintain the status quo. Abrupt cessation of funding will inevitably necessitate the discharge of all plaintiffs but those from affluent circum-

stances. The cost of care of the TCF recipients ranges upward from $6,000 per month, over $70,000 annually, an amount that exceeds the annual income, before taxes, of most New Yorkers.

The letter to the plaintiffs' parents from Woods School indicates the as-yet unexecuted threat of expulsion there. Pltf.Ex. 12. One Suffolk plaintiff was characterized as "essentially [having been] expelled from Perkins School for the Blind in Boston when the funding was cut off." June 6, 1996 Tr. at 12. Her mother was reduced to seeking a new placement for her in-state.

The distinction that forms the basis for the State's differential grant of rights was created in large part by State action. The State approved out-of-state placements when plaintiffs were children, the State approved continued out-of-state placement when plaintiffs became adults, under TCF, and State failure to provide in-state placement resulted in plaintiffs remaining out-of-state. The State has converted "certain similarly situated claims into dissimilarly situated ones, and then use[d] this distinction as the basis for its classification. This … is the very essence of arbitrary state action. The Equal Protection Clause imposes a requirement of some rationality in the nature of the class singled out, and that rationality is absent here." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 442, 102 S.Ct. 1148, 1161, 71 L.Ed.2d 265 (1982) (Quotations omitted.) (Blackmun, J., concurrence joined by Brennan, Marshall and O'Connor) (State agency violated state law by setting the hearing for an employment discrimination claim outside the 120 day conciliation period following the allegedly discriminatory act. The Supreme Court held that the Illinois Supreme Court violated the claimant's equal protection rights when it held that the agency's failure extinguished the claimant's right of action.)

The State treated out-of-state TCF recipients quite differently from in-state recipients following withdrawal from TCF. An OMRDD representative stated that the agency was, "[i]n those two cases [of in-state TCF recipients among the stranded Suffolk County TCF recipients], the case of the individual in Margaret Chapman … and the person in

Anderson School ..., we're going to work to try to find a certified basis." Kietzman, March 6, 1996 Tr. at 43. It was explained at the June 6, 1996 conference that OMRDD sought to "certify" the beds of TCF recipients at in-state facilities that were also child-care facilities. As a result, TCF residents in in-state facilities were eligible for transfer to OMRDD funding without any physical transfer while the State made no effort "to find a certified basis" to fund TCF recipients in out-of-state placements.

Here, the failure of the State to provide a suitable institutional placement in-state, both initially and subsequently upon their reaching adult status, coupled with continuing State approval of out-of-state institutional placement for these plaintiffs has denied them the protection provided under New York law and regulation to those institutionalized in-state. The State's accommodation of in-state TCF recipients when plaintiffs' locality terminated funding is in stark contrast to the State's treatment of out-of-state TCF recipients. This combination of State acts and omissions left plaintiffs stranded in out-of-state placements when the County discontinued TCF funding. The State is denying plaintiffs equal treatment with respect to others similarly situated in TCF but transferred in-state prior to the termination of funding and with respect to those TCF recipients originally placed in-state in facilities which OMRDD will "certify." As in *Logan,* 455 U.S. at 442, 102 S.Ct. at 1161, the State has converted "similarly situated claims into dissimilarly situated ones" and then used the state-created distinction in an invidious manner.

Applying the analytic framework used by the Second Circuit in *Quill,* the TCF statute also falls within the category of social welfare legislation and is subject to rational basis scrutiny upon judicial review. Not only does the State treat institutionalized severely developmentally disabled adults unequally with

respect to provision of rights and funding, it does not treat equally all TCF recipients upon withdrawal by a funding locality: those who are in in-state facilities are converted, at the facility in which they reside, to a "certified" basis for State funding and given great protection against involuntary transfer or discharge. No such effort is attempted with respect to those in out-of-state facilities who are denied funding and all other protection otherwise provided under State law.

The distinction between in-state and out-of-state TCF recipients does not further any legitimate state purpose where it exposes some of the State's most fragile citizens to great risk of harm[19] and does not further any State objective such as minimizing expense where, if anything, out-of-state care may be less expensive. *See Brooks v. Pataki* Tr. at 75–76. The State acknowledges the necessity of plaintiffs' institutional placements but has been unable to make identified in-state placements it asserts are appropriate and available at the time of TCF termination. The State has asserted that the out-of-state plaintiffs are not similarly situated with in-state TCF recipients or other adults in in-state residential placement because the variations in their disabilities means they are not similarly situated. Abramowitz, June 6, 1996 Tr. at 19. Although it is undisputed that plaintiffs' disabilities are varied and complex, where state law permits the conversion of in-state TCF placements to "certified" status with full State funding and full protection of rights under State law and regulation, but leaves out-of-state TCF placements stranded when a locality withdraws from the program, that law lacks a rational basis and is a violation of the Equal Protection Clause.

### 4. Procedural Due Process Violated by County's Withdrawal

■ The raison d'etre of TCF was the need for time to plan and effectuate transi-

---

**19.** It is interesting that, in *Quill,* the Second Circuit summarized a New York Court of Appeals case, *In re Storar,* decided with *In re Eichner,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981): "the Court of Appeals determined that a profoundly retarded, terminally-ill patient was incapable of making a decision to terminate blood transfusions. There, the patient

was incapable of making a reasoned decision, having never been competent at any time in his life." *Quill,* 80 F.3d at 727. Plaintiffs, also profoundly retarded, would appear also to be incapable of making the "voluntary" decision regarding institutionalization that the State has argued justifies its denial of any obligation to them in their current predicament.

tion from children's educational placements to adult placements for very fragile individuals. The entire history of transitional care establishes that eight weeks was a completely inadequate period in which either plaintiffs or the State could act to protect plaintiffs' interest in institutional conditions. Even though, based on the rulings by the Second Circuit and the New York courts, the plaintiffs have no entitlement under the State TCF statute or federal Constitutional law to continued funding, their justifiable reliance on the State and County for continued care imposes a procedural due process obligation of meaningful notice on those entities on the basis of promissory estoppel. Plaintiffs' position was inexorably changed in reliance on their out-of-state institutionalization in which the State played a determinative role and the County a critical supporting role.

For instance, as described above, Jason Goodhue was only four years old when he left his birth-home and was institutionalized at Woods School. He is now twenty-seven and has spent twenty-three years—a period nearly six times as long as that he spent at home—at the Woods School. He has not been "home" in fifteen years. Jason's father wrote Carole Touzalin of CBS, on December 21, 1995: "I am delighted that you will be able to visit Jason at Melmark, as it is impossible for us to bring him home and to meet his many needs. As a result, he has not been home to Katonah for over fifteen years." Pltf.Ex. 25. His out-of-state institutionalization has meant that, in this cruel game of musical chairs, neither in-state placement nor support for his out-of-state placement is presently available to him, and yet he cannot go home. As noted above, the State has written that a placement will be available in a CBS facility by the end of 1996. Pltf.Ex. 14. This results from the initial unavailability of in-state placement and the subsequent perception, fostered by the TCF statute, that location of a new placement was the State's responsibility; yet his "home" cannot accommodate him.

The State and the County, when terminating an entitlement to such critical care, have an obligation, derived from promissory estoppel principles, to provide Constitutionally adequate procedural due process. Although the approval and continuing support for out-of-state placement was a promise that was not based on consideration, the offer of funding acted, as the State and County knew it would, as an inducement for a radical change in the plaintiffs' position. Moreover, the funding was for many years subsidized under the Federal Education of the Handicapped Act, 20 U.S.C. § 1412, and the State's motivation in placing plaintiffs out-of-state was to obtain these funds despite its failure to provide in-state educational placements that complied with the standards of the Act. Having induced and supported plaintiffs' change of position on the basis of a program that promised support until "the office has offered an appropriate and currently available placement within the state, upon notification by the department that the office has offered such a placement and that available administrative appeals have been completed or that an administrative appeal has been offered and the time to request an appeal has lapsed," N.Y.Mental Hyg.L. § 13.38(c), the State and County should be estopped from abrupt termination of funding. This estoppel requires, at a minimum, provision of meaningful notice, a phase-out period that permits the former beneficiaries to make arrangements that mitigate their damages from their changed positions.

Should Congress decide to repeal the End–Stage Dialysis component of the Medicare program, surely it could not, under the Constitution, make the repeal effective immediately upon passage. To permit such a result would be to condemn a substantial number of people to a sure and unpleasant death who might have been able to arrange for, with adequate notice, at worst, palliative measures and, at best, alternative funding for their treatment or higher priority for a kidney transplant, had they had warning of a future certain ending date.

The Second Circuit found such estoppel arose from the City's course of conduct in connection with a resident's employment at a City hospital in *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 783 (1991), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 657, 116

L.Ed.2d 749 (1991), (quoting *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir.1983)):

> In determining which interests are afforded such protection, a court must look to whether the interest involved would be protected under state law and must weigh 'the importance to the holder of the right.' ... This method of selection [of chief resident, the position denied to the plaintiff] was not haphazardly applied; it was an established practice which was expressly highlighted in HHC's information documents.... It is plain that the practice predated [plaintiff's] admittance to the program and continued while she was there.... We think that this course of conduct, coupled with [plaintiff's] reliance thereon, created a contractual right that rose to the level of a significant property interest that would be protected under state law.

Here, too, the interest was not a trivial interest like a single work-assignment but was a significant interest. The course of conduct of both the County and the State, expressed in correspondence directed toward obtaining an appropriate and available in-state placement for plaintiffs, led to reasonable reliance on plaintiffs' parts that, until such a placement was in fact available and had been determined to be appropriate pursuant to the TCF review procedure, they would be supported in their out-of-state placements.

The notice provided by the County prior to its notice to plaintiffs that the State would assume funding on November 30, 1995 varied, but the strongest statement was that contained in the County's case manager's letter to Mr. Goodhue on September 25, 1995:

> I just wanted to reinforce the fact; although your intentions in passing up this placement are admirable, transitional funding will be ending in the near future. As I explained in my July 25 letter the Westchester County Department of Community Mental Health and the Letchworth Developmental Disabilities Service Office are trying to make sure that all the residential needs of the individuals in transitional funding are met before that happens.... [I]f you turn down this placement transi-

tion funding will not take over the financial responsibility of keeping Jason at Melmark Home and the residential placements that might be offered to him at that point, if any, might not be as appropriate as the one offered to him at the present. The other option available to him when this happens is that you might have to take him home.

Pltf.Ex. 23. (Emphasis added.)

This letter, as did others in a persistent course of State and County conduct, gave rise to plaintiffs' reasonable reliance that the availability of an appropriate placement in-state was a condition precedent to termination of their TCF funding.

### 5. The Need for a Preliminary Injunction

The parties have amply briefed and argued the history of TCF here, both directly and by reference from *Brooks* and *Suffolk*. The County defendants' dispute with my ruling is based on its conclusions of the law, not on my factual findings.

This case does not "turn[ ] on [disputes about] what happened." Were that not true, the holding that " 'where everything turns on what happened and that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum.' " *Forts v. Ward*, 566 F.2d 849, 852 (2d Cir.1977), quoting *Dopp v. Franklin National Bank*, 461 F.2d 873, 879 (2d Cir.1972), quoting *Securities and Exchange Comm'n v. Frank*, 388 F.2d 486, 491 (2d Cir.1968) would clearly mandate a hearing. As was also true in *Suffolk Parents*, however, this principle is simply inapplicable here.

The action of the Westchester County Department of Social Services in discontinuing participation in the TCF program, disputed by no party, is the basis for this order to Westchester County. The court finds, as a matter of law, that the notice provided by the County on November 30, 1995 was the first notice provided to plaintiffs that TCF funding would be terminated on January 31, 1996. It also finds it was inadequate, both in communicating funding termination and in the time from notice to termination, to constitute meaningful notice that would permit the plaintiffs to make alternative arrangements.

Similarly, the undisputed history of joint State and County involvement in TCF and State responsibility for case management provides clear support for dividing responsibility for phase-out of TCF between the two levels of government while placing ultimate responsibility on the State should it fail to complete transition during that phase-out period. The circumstances, therefore, fully satisfy the requirements for issuance of a preliminary injunction.

■ It is well settled within the Second Circuit that: "[t]he purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute." *Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.*, 732 F.2d 1095, 1099 (2d Cir.1984); *see, e.g., JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75 (2d Cir.1990). Plaintiffs have met all parts of the standard for a preliminary injunction:

> The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigating and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

■ The absence of meaningful notice in the abrupt end of the County's TCF funding demonstrates the existence of "sufficiently serious questions going to the merits" of the alleged constitutional violation to satisfy the second prong of the standard with respect to the County as well as the State. This makes a fair ground for litigation with a substantial likelihood of success on the merits. *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977).

There is no question that the balance of hardships tips toward plaintiffs, whose very functioning is threatened, while the incremental cost to the County, sixty percent of which will be reimbursed from statutorily authorized State funds, although not an insignificant amount in these times of budgetary pressure, is undoubtedly a small portion of its total budget. Further, if the State has not completed placement in six months, the hardship to the State from funding out-of-state placements, which are no more expensive than the in-state placements the State has asserted its willingness to provide, cannot be great.

The appearances by a representative for The Woods School in these matters has brought to the Court's attention the critical problem faced by the private organizations currently caring for the plaintiffs. The Woods School has not received payment on behalf of the Westchester County TCF recipients since County funding was terminated at the end of January 1996. The Woods School and the other institutions are now confronted with a conflict between their ability to care for these individuals and their duty to protect the financial health of their institutions which directly impacts upon their ability to serve others. Woods School has already suffered substantial losses from the gap in funding for City and Suffolk County placements since these jurisdictions' terminations of funding, and, thus, is in a weaker position to subsidize unfunded New York State residents than it was last year.

The prospect of irreparable harm is " 'not remote or speculative but ... actual and imminent.' " *Jackson Dairy, Inc.* at 72 (quoting *New York v. Nuclear Regulatory Comm.*, 550 F.2d 745, 755 (2d Cir.1977)). The harm that will be caused to these severely disabled persons by a hasty transfer as the institutions discharge plaintiffs, which they will inevitably be forced to do if funding is not restored, certainly cannot be repaired by money damages. Although the full extent of damage resulting from the precipitate transfer of Ricardo Silvera at the termination of Westchester County's TCF participation, the description in the complaint at least hints at the harm that may befall these plaintiffs, from a poorly planned transfer. The balance of hardships tips unquestionably in the direction of the plaintiffs.

**Conclusion**

The court grants the plaintiffs' motion for a preliminary injunction and orders the Westchester County defendants to resume funding the TCF recipients' placements, including arrears to February 1, 1996, for a period of six months from the date of this order, so as to provide TCF recipients and the State the opportunity to arrange alterna-

tive care in an orderly manner. However, the order with respect to the County defendants is stayed, pending appeal, on the basis of the stay granted by the Second Circuit to Suffolk County on an essentially similar factual basis, and the State defendants are ordered to use all good efforts to assist the plaintiffs in obtaining appropriate alternative care. The State is ordered, as of the date of this order, to take all necessary steps including, but not limited to, payment of out-of-state facilities at which any plaintiffs still reside under TCF, to maintain plaintiffs in their TCF placement until orderly transition to permanent State approved placement or other discharge arrangement is accomplished. Should the plaintiffs prevail on appeal in their claim against the County, the State will be entitled to reimbursement of forty percent of the costs for the six month period following the date of this order. Failure of any plaintiff to cooperate with reasonable requests related to developing placement plans or to accept an appropriate, available placement, shown by the State or County to the satisfaction of this court, is grounds for termination of the interim funding for that individual under this order.